STATE EX REL. REYNOLDS, Governor, Relator, v. ZIMMER-
MAN, Secretary of State, Respondent: PANZER, Senate
President *pro tem,* and HAASE, Speaker of the Assembly,
Intervening Respondents.

*January 10—February 28, 1964.*

For the relator there were briefs and oral argument by *Roland B. Day* of Madison, special counsel.

For the respondent there was a brief by *Roger C. Minahan*, special counsel, attorney, and *Whyte, Hirschboeck, Minahan, Harding & Harland* of counsel, all of Milwaukee, and oral argument by *Roger C. Minahan*.

For the intervening respondents there was a brief and oral argument by *Francis J. Wilcox* of Eau Claire, special counsel.

A brief *amicus curiae* was filed by *John J. Fleming*, city attorney of Milwaukee, and *Harry G. Slater*, deputy city attorney, for the city of Milwaukee.

A brief *amicus curiae* was also filed by *Maxwell H. Herriott* of Milwaukee.

WILKIE, J. Five issues are raised in this original action. They are:

1. Does the relator, as governor, have standing to allege that a particular reapportionment plan violates both the

state and federal constitutional rights of the citizens of the state of Wisconsin?

2. May the legislature reapportion the legislative districts of the state of Wisconsin without the concurrence of the executive?

3. Assuming that the reapportionment plan set forth in ch. 4, Stats. 1961, is a violation of art. IV, Wis. Const., may this court grant some form of affirmative relief?

4. Is the reapportionment scheme set forth in ch. 4, Stats., a violation of the standard of per capita equality of representation set forth in sec. 3, art. IV, Wis. Const.?

5. Assuming that the "Rosenberry plan" is inconsistent with the standard of per capita equality of representation, what is the most appropriate form of relief that this court can offer?

Issue 1. *Does the relator, as governor, have standing to allege that a particular reapportionment plan violates both the state and federal constitutional rights of the citizens of the state of Wisconsin?*

This court has consistently held that the state, acting either through the governor or the attorney general, may challenge the constitutionality of a state reapportionment plan as a violation of *state* constitutional rights of the citizens.

"We, therefore, hold that the governor is authorized under sec. 14.12 to direct the attorney general to commence a *parens patriae* type of action to enforce the constitutional rights of its citizens, . . .

"It is firmly established by the decisions of this court that the state is the proper party plaintiff to test the validity of an apportionment law in order to protect the constitutional right of its citizens to an equitable apportionment." [3]

---

[3] *State ex rel. Reynolds v. Smith* (1963), 19 Wis. (2d) 577, 586, 120 N. W. (2d) 664. See also *State ex rel. Attorney General v. Cunningham* (1892), 81 Wis. 440, 51 N. W. 724; *State ex rel. Lamb v. Cunningham* (1892), 83 Wis. 90, 53 N. W. 35.

While it is generally true that a state, as *parens patriae,* may not assert violations of *federal* constitutional rights on behalf of its citizens,[4] it is reasonably clear that a claim that a malapportionment denies equal protection of the laws must be treated as an exception to this rule. In *Colegrove v. Green*[5] the court, addressing itself to the problem of the standing of private plaintiffs, said:

"The basis for the suit is not a private wrong, but a wrong suffered by Illinois as a polity."

Therefore, the court recognized that a claim of denial of equal protection as the result of malapportionment was not necessarily a claim of an individual injury. In *Colegrove,* of course, the United States supreme court went on to hold that the substantive claims raised by the plaintiffs were not justiciable because they were "political questions." In *Baker v. Carr, supra,* the United States supreme court ruled that an allegation that a malapportionment denied equal protection of laws was a justiciable issue.

We conclude that the state, as the representative of the polity, must be permitted to raise the substantive issues surrounding the constitutionality of an apportionment under the provisions of either the state or federal constitutions.

Issue 2. *May the legislature reapportion the legislative districts of the state of Wisconsin without the concurrence of the executive?*

The respondent and the intervening respondents maintain that the legislature may effect a valid reapportionment of the state's legislative districts by joint resolution, *i.e.,* without the concurrence of the executive. Their argument derives from a largely textual analysis of the constitution. Sec. 3, art. IV, Wis. Const., relating to apportionment of state legislative districts, states:

---

[4] *Massachusetts v. Mellon* (1923), 262 U. S. 447, 43 Sup. Ct. 597, 67 L. Ed. 1078.

[5] (1946), 328 U. S. 549, 552, 66 Sup. Ct. 1198, 90 L. Ed. 1432.

"At their first session after each enumeration made by the authority of the United States, *the legislature shall* apportion and district anew the members of the senate and assembly, according to the number of inhabitants, excluding Indians not taxed, soldiers, and officers of the United States army and navy." (Emphasis added.)

Sec. 10, art. XIV, Wis. Const., relating to apportionment of federal congressional districts, provides:

"Two members of congress shall also be elected . . . and until otherwise *provided by law* the counties of . . . shall constitute the first congressional district, and elect one member; . . ." (Emphasis added.)

In view of the language of sec. 10, art. V, Wis. Const., to wit:

"Every bill which shall have passed the legislature shall, before it becomes a law, be presented to the governor; . . ."

the respondents argue that the deletion of the words "by law" from sec. 3, art. IV, whereas the words "by law" were expressly included under sec. 10, art. XIV, dealing with apportionment of congressional districts, indicates an intention on the part of the framers of the original constitution to permit the legislature an option as to whether to apportion the state legislature by law with the concurrence of the executive, or by joint resolution, requiring no such concurrence.

We can see no reason why the constitutional framers should have intended that the congressional redistricting must be by law but that legislative redistricting might be by action of the legislature alone.

An examination of the entire text of art. IV, Wis. Const., relating to legislative powers, reveals numerous sections providing that "the legislature shall" discharge some sub-

stantive function of government.[6]  Many of these functions are the essence of government and the respondents do not contend that in these areas the absence of the words "by law" means that the legislature may act unilaterally.

Since sec. 3, art. IV, Wis. Const., does not specify that the legislature shall apportion the legislative districts "by law," and since joint action is required of the legislature and the governor in many of the areas where the words "by law" are omitted, it is clear that there is an ambiguity as to the scope of legislative power to reapportion without concurrence of the chief executive.  To resolve this ambiguity we must construe sec. 3, art. IV, in the most-reasonable manner in relation to the fundamental purpose of the constitution as a whole, to wit: To create and define the institutions whereby a representative democratic form of government may effectively function.  Sec. 3, art. IV of the constitution, lays down a standard in unambiguous terms for the apportionment of

[6] Sec. 1, art. III, Wis. Const. "Every person, of the age of twenty-one years or upwards, belonging to either of the following classes, who shall have resided in the state for one year next preceding any election, and in the election district where he offers to vote such time as may be *prescribed by the legislature,* not exceeding thirty days, shall be deemed a qualified elector at such election: . . ."

Sec. 23, art. IV, Wis. Const. *"The legislature shall establish but one system of town and county government,* which shall be as nearly uniform as practicable."

Sec. 26, art. IV, Wis. Const. *"The legislature shall* never grant any extra compensation . . ."

Sec. 7, art. VII, Wis. Const. ". . . *the legislature may,* from time to time, authorize additional circuit judges to be chosen. . . ."

Sec. 5, art. VIII, Wis. Const. *"The legislature shall provide for an annual tax* sufficient to defray the estimated expenses of the state for each year; and whenever the expenses of any year shall exceed the income, *the legislature shall provide for levying a tax* for the ensuing year, sufficient, with other sources of income, to pay the deficiency as well as the estimated expenses of such ensuing year." (Emphasis added.)

Wisconsin legislative districts. The assembly and senate districts are to be apportioned "according to the number of inhabitants." Sec. 4, art. IV, states that each apportionment is subject to the requirement that such assembly districts "be bounded by county, precinct, town or ward lines, to consist of contiguous territory and be in as compact form as practicable." Sec. 5, art. IV, states that each such apportionment is subject to the further requirement that "no assembly district shall be divided in the formation of a senate district." Thus the constitution itself commits the state to the principle of per capita equality of representation subject only to some geographical limitations in the execution and administration of this principle.

The constitution contains no consciously built-in standard of apportionment that reflects area or any other geographical factor. An historical governmental unit such as a county is not absolutely entitled to one representative regardless of population in at least one house of the legislature. The Wisconsin constitution does not provide for a "little federal plan." [7] The requirements set forth in secs. 4 and 5, art. IV, prescribe rules for laying out legislative districts all operating within the overall constitutional standard of per capita equality of representation.

Since the constitution itself places such heavy emphasis on the requirement that the legislative districts be apportioned "according to the number of inhabitants" it would be unreasonable to hold that the framers of the constitution intended to exclude from the reapportionment process the one

---

[7] *Maryland Committee for Fair Representation v. Tawes* (1962), 228 Md. 412, 180 Atl. (2d) 656. Maryland constitution provides that one house of the legislature be apportioned in direct ratio to population. In the other house, each county is entitled to one representative regardless of population. The Maryland supreme court found this apportionment to be consistent with the Fourteenth amendment. The United States supreme court granted certiorari (1963), 374 U. S. 804, 83 Sup. Ct. 1691, 10 L. Ed. (2d) 1029.

institution guaranteed to represent the majority of the voting inhabitants of the state, the governor.

Both the governor and the legislature are indispensable parts of the legislative process. It is often said that the governor proposes and the legislature disposes. Not only does the governor have the constitutional authority to convene the legislature on extraordinary occasions,[8] but also he has the power to communicate to the legislature at every session on the condition of the state and his precise recommendations for the legislature's consideration on such matters as he may deem appropriate.[9] When the legislature finally has adopted a bill by action of both houses he has the general power of veto,[10] and when he has vetoed a bill it cannot become law unless both houses of the legislature vote to override that veto.[11] The apportionment of both houses of the legislature is vital to the functioning of our government. There is just as much reason for considering it as one of the basic functions that requires full legislative treatment as any other major phase of government activity which admittedly requires joint action by the legislature and the governor. Because the governor is given such an important role by our constitution in the entire legislative process, it is reasonable to conclude that the framers of the constitution intended to require his participation in all decisions relating to legislative reapportionment, a specific issue which obviously affects the legislative process as a whole.

Respondents argue that the constitution may be amended without the concurrence of the governor; and that the legis-

---

[8] Sec. 4, art. V, Wis. Const. "The governor shall . . . have power to convene the legislature on extraordinary occasions, . . . He shall communicate to the legislature, at every session, the condition of the state, and recommend such matters to them for their consideration as he may deem expedient. . . ."

[9] Ibid.

[10] Sec. 10, art. V, Wis. Const.

[11] Ibid.

lature may, by joint resolution, submit a referendum directly to the people of the state. However, in these circumstances, the voters are given a chance to express themselves and there is no need for them to speak through the governor, who is the only person involved in the legislative process that represents the people as a whole.

Historically, all apportionment of Wisconsin legislative districts has been accomplished by the joint efforts of the legislature and the governor in passing and signing into law a particular reapportionment bill.

In *State ex rel. Broughton v. Zimmerman* [12] we held, at page 407:

"The power and duty imposed upon the legislature by the constitution to reapportion the state after each federal census can only be exercised by both the houses of the legislature passing a bill that becomes a law upon the signature of the governor and publication, or, if the governor should veto it, upon repassage by the required vote over his veto, and publication. All prior reapportionments of the state during the past one hundred four years of its history have been accomplished in this manner by laws enacted by the legislature."

Thus, both the legislative and executive branches of our state government have long regarded legislative reapportionment as a matter for joint action between the legislature and the governor. In issues relating to the relative power of coordinate branches of government, the view of the constitutional allocations of power adopted by the political branches of government will be given great weight by the court when called upon to make an authoritative judicial determination of the scope of authority. [13]

---

[12] (1952), 261 Wis. 398, 52 N. W. (2d) 903.

[13] *Myers v. United States* (1926), 272 U. S. 52, 47 Sup. Ct. 21, 71 L. Ed. 160; *Humphrey's Executor v. United States* (1935), 295 U. S. 602, 55 Sup. Ct. 869, 79 L. Ed. 1611; *Smiley v. Holm* (1932), 285 U. S. 355, 52 Sup. Ct. 397, 76 L. Ed. 795.

We, therefore, conclude that legislative districts of the state of Wisconsin cannot be apportioned without the joint action of the legislature and the governor and that therefore Joint Resolution No. 49 is invalid. This being so, the constitutional merits of this apportionment measure are not before us.

Issue 3. *Assuming that the reapportionment plan set forth in ch. 4, Stats. 1961, is a violation of art. IV, Wis. Const., may this court grant some form of affirmative relief?*

Since Joint Resolution No. 49 is invalid, we now come to a consideration of the validity of ch. 4, Stats., the so-called Rosenberry apportionment plan, on the basis of which the present legislature has been elected.

In *State ex rel. Martin v. Zimmerman* [14] this court held that a reapportionment scheme that was "valid" when enacted cannot become unconstitutional simply because of shifts in population over a period of time, which produce sharp deviations in the legislative districts from the express standard of per capita equality of representation set forth in sec. 3, art. IV, Wis. Const.

In *Martin,* the legislature had failed to reapportion pursuant to the 1940 census. The relator attempted to enjoin the respondent from conducting the 1946 state legislative elections pursuant to ch. 27, Laws of Sp. Sess. 1931–1932. This court, without passing on the merits of relator's contention that the application of the apportionment scheme enacted in 1931–1932 to the population distribution existing in 1946 was a frustration of the apportionment standard of per capita equality, dismissed the suit reasoning:

"We very readily reach the conclusion that the prayer of the petitioner, if granted, would lead to a disastrous situation. A fair apportionment in establishing boundaries to legislative districts should be made, not merely in response

---

[14] (1946), 249 Wis. 101, 23 N. W. (2d) 610.

to the constitutional fiat, but for the purpose of preserving important political rights of the people. Since this court, however, concededly cannot compel the legislature to act, the enforcement of the constitutional mandate in this respect must be settled in the political forum as an issue involved in the candidacy for seats in the senate and assembly. The mandate is in the constitution and it runs to the legislature. The legislature being a co-ordinate branch of the government may not be compelled by the courts to perform a legislative duty even though the performance of that duty be required by the constitution. The court cannot initiate by judicial action legislation which has been placed in the hands of the legislature. . . . The court has no commission and has been given no power to require the legislature to act in a given particular." [15]

The court further reasoned that the rationale of *Colegrove v. Green, supra,* was appropriate to the disposition of this case.

" 'The constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action. . . . The constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights.' *Colegrove v. Green, supra.*" [16]

In *State ex rel. Broughton v. Zimmerman, supra,* this court reaffirmed the rule that a reapportionment statute (ch. 728, Laws of 1951) valid when enacted, could not be declared unconstitutional simply because population shifts over time produced districts of grossly unequal populations. The court reasoned that since it was without power to grant affirmative relief, it could not declare an existing statute unconstitutional leaving the state without election machinery.

[15] *State ex rel. Martin v. Zimmerman, supra,* p. 103.
[16] Id., p. 111.

Again, the court grounded its result in the rationale of *Colegrove v. Green, supra:*

"Furthermore, as the United States supreme court recently declared in its decision in *Colegrove v. Green* (1946), 328 U. S. 549, 66 Sup. Ct. 1198, 90 L. Ed. 1432, reapportionment ordinarily presents a political question and not a justiciable one. . . . The United States supreme court in its opinion declared (pp. 553, 556) :

" 'Nothing is clearer than that this controversy concerns matters that bring courts into immediate and active relations with party contests. From the determination of such issues this court has traditionally held aloof. It is hostile to a democratic system to involve the judiciary in the politics of the people. And it is not less pernicious if such judicial intervention in an essentially political contest be dressed up in the abstract phrases of the law. . . .

" '. . . The constitution has many commands that are not enforceable by courts because they clearly fall outside the conditions and purposes that circumscribe judicial action. . . . The constitution has left the performance of many duties in our governmental scheme to depend on the fidelity of the executive and legislative action and, ultimately, on the vigilance of the people in exercising their political rights.'

"Because controversies over apportionment are ordinarily political in nature, courts should be hesitant to intervene therein." [17]

*Baker v. Carr, supra,* overruled the precise holding in *Colegrove v. Green,* that the denial of political rights through malapportionment presented no justiciable issue. The dilution of voting power caused by malapportionment may be a denial of equal protection of the law under the Fourteenth amendment.

The result in *Baker v. Carr,* dealing as it does with federal constitutional rights, does not automatically overrule either *Martin* or *Broughton,* which dealt only with the question of affirmative judicial relief for denial of state constitutional

---

[17] *State ex rel. Broughton v. Zimmerman, supra,* p. 412.

rights under sec. 3, art. IV, Wis. Const. However, because this court held that affirmative relief would transgress the domain of a co-ordinate branch of government, and expressly relied upon the "political question" rationale of *Colegrove* to reach this conclusion, we must reconsider these cases.

Surely there is more reason to grant affirmative relief for denial of voting rights by malapportionment under sec. 3, art. IV, than under the equal-protection clause of the Fourteenth amendment. One of the primary reasons for deeming apportionment issues nonjusticiable under the Fourteenth amendment was the supposed inability of the federal court to develop reasoned, precise standards to determine whether any given discrimination in voting power was so irrational as to be invidious.[18] Yet the Wisconsin constitution itself provides a standard of reapportionment "meet for judicial judgment."[19] The legislature shall reapportion "according to the number of inhabitants" subject to some geographical and political unit limitations in execution of this standard. We need not descend into the "thicket" to fashion standards whole-cloth.

In *Broughton, supra,* this court noted, at page 413:

"However, if the legislature enacts an apportionment statute which attempts to apportion the state in a way which is contrary to the provisions of the state constitution, so that it is impossible to reconcile the action taken with the constitution, then it is the duty of the courts to hold the same unconstitutional."

Yet what is the distinction between a plan which, when enacted and applied *immediately,* denies per capita equality of representation, and a plan which, though valid when enacted, denies per capita equality of representation when applied some years later after substantial shifts in population

---

[18] *Baker v. Carr, supra,* p. 217.

[19] *Baker v. Carr, supra,* p. 289 (dissenting opinion of Mr. Justice FRANKFURTER).

have occurred. At the moment the court considers the constitutionality of either plan, the denial of the constitutional right has the same magnitude.

Under the view of *Broughton* and *Martin*, this court would have had to sustain the Tennessee apportionment at issue in *Baker v. Carr, supra.* The Tennessee constitution provided for decennial apportionment of representatives and senators among counties and districts according to their respective numbers. The legislature had failed to make such a reapportionment since 1901. Although it was conceded that the apportionment was valid when enacted, some sixty years previous, population changes had produced a situation in which the votes of some persons in the state were less than 1/19th and 1/8th the weight of the votes of others in the choice of a representative.[20] Under the rationale of *Broughton* and *Martin*, this court could not declare such an apportionment to be a violation of sec. 3, art. IV, Wis. Const., because the original plan was "valid" when enacted, and the present deviations from the principle of per capita equality of representation are the result of population shifts rather than affirmative legislative action.

It is clear that the rationale of these cases, as in *Colegrove v. Green, supra,* is predicated upon the notion that affirmative correction of apportionment inequities must not be made by the courts but by legislative action because "[t]he legislature being a co-ordinate branch of the government may not be compelled by the courts to perform a legislative duty even though the performance of that duty be required by the constitution."[21]

Yet the fallacy of withdrawing affirmative judicial protection from voting rights lies in the self-perpetuating nature of the disenfranchisement. As recently noted:

[20] *Id.*, p. 245.
[21] *State ex rel. Martin v. Zimmerman, supra,* p. 104.

"We are told . . . that redress of the *Colegrove* wrong should be sought in the electoral process, but is this a practicable suggestion, when the wrong complained of is the corruption of the electoral process?" [22]

If the principle of per capita equality of representation set forth in art. IV, Wis. Const., is not to be defeated by legislative inaction, this court must be able to grant affirmative relief in cases where malapportionment is a result of population shifts shown by the latest census and occurring since the preceding opportionment. The citizens of this state can now obtain affirmative judicial relief from federal courts upon a showing that the voting power discriminations resulting from malapportionment deny them equal protection. Since a denial of voting rights deemed to be a denial of the general standards of equal protection of the law under the Fourteenth amendment would also be a denial of the specific standard of representation in direct ratio to population in art. IV, there is no reason for Wisconsin citizens to have to rely upon the federal courts for the indirect protection of their state constitutional rights. To the extent that *Broughton* and *Martin* have held that the unavailability of affirmative judicial relief forecloses a determination on the merits of whether a reapportionment scheme, valid when passed, is presently unconstitutional due to intervening population shifts, they are overruled.

Issue 4. *Is the reapportionment scheme set forth in ch. 4, Stats., a violation of the standard of per capita equality of representation set forth in sec. 3, art. IV, Wis. Const.?*

We now turn to a consideration of whether the Rosenberry apportionment plan is invalid. As we have seen, sec. 3, art. IV, Wis. Const., contains a precise standard of apportionment—the legislature shall apportion districts according to the number of inhabitants.

---

[22] C. L. Black, Inequities in Districting for Congress: Baker v. Carr and Colegrove v. Green, 72 Yale Law Journal (1962), 13, 14.

The "rationality" of apportioning representatives in direct ratio to the population was affirmed when the constitution, embodying the specific standard of sec. 3, art. IV, was ratified.

It is assumed by all parties and understood by this court that a mathematical equality of population in each senate and assembly district is impossible to achieve, given the requirement that the boundaries of local political units must be considered in the execution of the standard of per capita equality of representation.

It is equally clear, however, that a valid reapportionment "should be as close an approximation to *exactness* as possible, and [that] this is the utmost limit for the exercise of legislative discretion." [23]

Again, in *State ex rel. Lamb v. Cunningham* [24] this court reasoned, at page 146:

"The requirement that assembly districts must be as nearly equal in population as the other constitutional provisions will permit is just as applicable to two or more assembly districts in a single county as to an assembly district composed of two or more counties. While the act here in question in the main conforms to those requirements of the constitution which *prevent equality of representation,* yet it almost wholly disregards the only constitutional requirement particularly *designed to secure such equality as near as practicable."*

Application of the per capita equality-of-representation standard permits deviations from a mathematical norm only to the extent that it is necessary to avoid dismembering a county unit. Several districts may be formed in one county. The only result that must be avoided is an assembly district which combines a portion of one county with either (1) one or more entire county units, or (2) a portion of another

[23] *State ex rel. Attorney General v. Cunningham* (1892), 81 Wis. 440, 484, 51 N. W. 724.
[24] (1892), 83 Wis. 90, 53 N. W. 35.

county.[25] This requirement does not build a competing geographical or autonomy of local unit standard of apportionment into the constitution. Sec. 3, art. IV, Wis. Const., does not require every county to have at least one assemblyman or senator regardless of population. Therefore, the legislature must apportion in direct ratio to population, subject only to (1) practical limitations in execution of this principle, and (2) precise constitutional restrictions about observance of governmental boundaries in drawing district lines.

The secretary of state seeks to limit the application of the *Cunningham Cases* by arguing that the court only condemned gerrymandering, defined as the drawing of districts to preserve partisan political advantage, and therefore, because there is no finding of a desire to preserve the political *status quo* behind the apportionment present in this case, the *Cunningham* decisions have little relevance for the matter at hand. It is true that the court in the *Cunningham Cases* found that the scheme of apportionment, held to be inconsistent with art. IV, Wis. Const., was designed to preserve the power of the majority party. However, the malapportionment present in those cases was not found to be a "gerrymander" as that term is generally understood. "Gerrymandered" districts may be of equal population, but their physical shape has been manipulated for partisan advantage.[26] There was no allegation of simple manipulation of

---

[25] *State ex rel. Attorney General v. Cunningham, supra,* pp. 522, 528.

[26] *Gomillion v. Lightfoot* (1960), 364 U. S. 339, 81 Sup. Ct. 125, 5 L. Ed. (2d) 110. An Alabama statute altered the municipal boundaries of the city of Tuskegee "from a square to an uncouth twenty-eight-sided figure." The effect was to deny any municipal franchise to all but four or five qualified Negro voters. The court found the statute to be a violation of the Fifteenth amendment, prohibiting states from denying Negroes the right to vote. The court distinguished *Colegrove v. Green, supra,* on the grounds that petitioners alleged *total denial of right to vote on racial standards* rather than a *relative diminution of voting power because of malapportionment.*

physical contours in *Cunningham,* or an allegation of total denial of franchise within a given governmental unit. The court held that any substantial deviation from per capita equality of representation producing a relative dilution of voting power, the essence of the factual allegations presented by the relator, violated art. IV, regardless of the motivation of the legislature.

In determining whether the Rosenberry plan fails to achieve a practical approximation of the standard of per capita equality of representation, we have utilized a statistical method which seeks a comparison between the largest and the smallest district, according to population, in relation to each other and the average or theoretically perfect district.

Of course, the theoretical norm, or average district population, is obtained by dividing the total state population by number of assembly and senate districts. For the senate districts, the figure predicated upon the 1960 census figures is 119,780,[27] and for assembly districts, 39,528.

The population of the largest senate district, the 33d, is 208,343. The population of the smallest district, the 25th, is 74,293. Therefore, the population of the largest district is 280 percent of the smallest. This means that the votes of

*Wright v. Rockefeller* (S. D. N. Y. 1962), 211 Fed. Supp. 460, affirmed (1964), 376 U. S. 52, 84 Sup. Ct. 603, 11 L. Ed. (2d) 512 (decided February 17, 1964). The boundaries of the 17th congressional district in New York City were expanded as part of an attempt to bring the population of the district up to "average" or theoretical norm predicated upon per capita standard. Petitioner claimed that the boundaries were drawn so as to exclude Negroes and Puerto Ricans from the district and so as to totally disenfranchise them within this particular governmental unit, the 17th, by placing them in three adjoining districts, Nos. 18, 19, and 20. No claim was made of relative dilution of voting power because of malapportionment. The United States supreme court affirmed a district court holding that petitioner had failed to prove that a racial standard was utilized in drawing the new lines.

[27] Statistical data is based upon charts prepared by the Wisconsin legislative council.

persons in the 33d senatorial district are less than one half in weight of the votes of persons in the 25th district. The 33d senatorial district is 73.9 percent greater than the norm district, and the population of the smallest district is 38 percent less than that of the "ideal" district.

The assembly districts present a picture of even-sharper deviation from the standard of per capita equality of representation. The largest assembly district, Waukesha 2d, has a population of 87,486. The smallest district, Douglas 1st, 19,651. Waukesha 2d is 445 percent larger than Douglas 1st. This, of course, means that single votes in Douglas have four times the weight of single votes in Waukesha.

The largest district is 121.3 percent greater than the norm; the smallest, 50.3 percent of the norm.

Let us compare these figures with comparable figures under reapportionment plans previously considered by this court.[28]

With 100 as the norm of per capita equality of representation, the range in deviation for senate districts under *Cunningham* was from 121.1 to 73.2. The Rosenberry range is from 173.9 to 62.0. Therefore, the Rosenberry plan represents a greater deviation from the standard than did the *Cunningham* plan which was deemed unconstitutional.

In *State ex rel. Lamb v. Cunningham, supra,* the deviation from the norm ran from 129 percent to 60 percent. In comparison with this scheme, also declared unconstitutional, the Rosenberry plan is inferior.

In *State ex rel. Bowman v. Dammann*[29] this court sustained a reapportionment plan in which the deviation from standard for the largest and smallest assembly district ranged

---

[28] These figures predicated on the same methods utilized by Wisconsin legislative council are contained in Appendix B of Goldberg, The Statistics of Malapportionment, 72 Yale Law Journal (1962), 90, 102, 104.

[29] (1932), 209 Wis. 21, 243 N. W. 481.

from 199.3 to 55.1. The comparable range under the Rosenberry plan is from 221.3 to 49.7. The Rosenberry plan thus can be distinguished from the plan validated in *Bowman.*

A reapportionment plan which permits a deviation from an equal population norm of 100, ranging from 221.3 (largest district) to 49.7 (smallest district) in assembly districts, and a similar deviation in senate districts from 173.9 (largest district) to 62 (smallest district), does not conform to the standard of per capita equality of representation. Ch. 4, Stats., is, therefore, a violation of sec. 3, art. IV, Wis. Const.

Issue 5. *Assuming that the "Rosenberry plan" is inconsistent with the standard of per capita equality of representation, what is the most-appropriate form of relief that this court can offer?*

Paul A. Freund has noted:

"The question is not whether the courts can do everything but whether they can do something. Moreover, the cleavage between growth from within and alteration imposed from without is not absolute. Education and the practice of self-improvement may be fostered by judicious judicial intervention." [30]

Having ruled that ch. 4, Stats., has ceased to be valid and is unconstitutional primarily because it permits a few great deviations on either side of a norm representing apportionment in direct ratio to population and having concluded that this court has the power to adopt on our own initiative a reapportionment plan which conforms to the requirements of art. IV, Wis. Const., we come to the question of whether we should now order a particular plan to be followed in the 1964 elections.

We have decided that although the legislative process has not produced a redistricting act from 1961 to the present, it

[30] Freund, The Supreme Court and Civil Liberties, 4 Vanderbilt Law Review (1951), 533, 552.

is appropriate that the senate, the assembly, and the governor have a further opportunity by May 1, 1964, to enact a valid plan.

Such policy choices as can legitimately be made within constitutional limits ought, we are convinced, to be made through the legislative process.

Our preliminary consideration of the problem of drafting a plan convinces us that there is no single plan which the constitution, as a matter of law, requires to be adopted to the exclusion of all others, and that there are choices which can validly be made within constitutional limits.

It is clear that under our state constitution it is impossible to devise any plan under which every assembly district will have exactly the same number of people, or even approximately the same number within close limits. This is true because under the constitution an assembly district must either comprise one or more entire counties or must consist of only a portion of a single county. By historical accident, for example, it is impossible to combine Calumet county with a population of 22,268, with any one of its neighboring counties without providing an assembly district in which the people would be grossly underrepresented. It follows that Calumet county must constitute one assembly district even though under this circumstance its people will be substantially overrepresented.

It follows that in order to compensate for this necessary overrepresentation of one county, people in other areas will necessarily be underrepresented. There are other situations where a choice must be made between fairly substantial over-representation and fairly substantial underrepresentation.

Because of the concentration of people in the single county of Milwaukee it happens to be possible to achieve a close approximation, on the average, of ideally sized assembly districts within that county. The assignment of 26 assembly

seats to Milwaukee county would result in districts in that county which deviate from the norm only in a minor degree. But because of the difficulties encountered in other portions of the state such as the one previously mentioned with respect to Calumet county, the allocation of 26 seats to Milwaukee county might require drawing districts elsewhere which would result in a more substantial underrepresentation of people. Thus it cannot categorically be said that the constitution requires allocation of 26 seats to Milwaukee county even though such allocation would accomplish in that county an approximation of the ideal size of district. See *State ex rel. Bowman v. Dammann, supra.*

Whether or not a small deviation from the theoretical norm in a large number of districts is more desirable than having a larger deviation from the theoretical norm in one or a few districts calls for the exercise of judgment and a balancing of considerations in the field of policy; these choices should be made in the legislative process rather than in the judicial process, and the court should make these choices only when it becomes absolutely necessary to do so.

We do not abdicate our power to draft and execute a final plan of apportionment which conforms to the requirements of art. IV, Wis. Const., should the other arms of our state government be unable to resolve their differences and adopt a valid plan. If such a plan has not been enacted into law by May 1, 1964, we have determined that this court will promulgate such a plan by May 15, 1964, and in sufficient time for the process of nomination and election thereafter.

Should it become necessary for this court to execute such a plan of apportionment, such plan in any event would be provisional, to be effective for the 1964 elections and thereafter until such time as the legislature and governor through the ordinary legislative process, have themselves enacted a valid apportionment plan.

*By the Court.*—It is adjudged and determined:

1. Enrolled Joint Resolution No. 49, Laws of 1963, is invalid.

2. Ch. 4, Stats. 1961, is invalid.

3. The respondent is enjoined from calling the 1964 Wisconsin legislative elections pursuant to either Joint Resolution No. 49 or ch. 4, Stats.

4. On May 1, 1964, the relator shall return to this court and certify as the fact may be

(1) that a bill on legislative apportionment has been adopted by the legislature and approved by the governor or passed by the legislature over the governor's veto;

(2) that the legislature has failed to pass such a bill; or

(3) that such a bill has been adopted by the legislature, vetoed by the governor and not passed by the legislature over that veto.

5. Should a valid legislative apportionment plan not be enacted by May 1, 1964, this court, by May 15, 1964, will execute a plan of such apportionment pursuant to which the 1964 legislative elections shall be called.