A.W. PONATH, Acting Corporation Counsel, Outagamie County
You have requested my opinion on several questions relating to the office of county executive which may be created pursuant to sec. 59.032, Stats. You first inquire as to the date when the county executive takes office.
Section 59.032 (1), Stats., provides in part as follows:
"* * * ELECTION; TERM OF OFFICE. Counties having population of less than 500,000 may by resolution of the county board or by petition and referendum create the office of county executive. The county executive shall be elected the same as a county executive is elected under s. 59.031 (1) for a term of 4 years commencing with the 1st spring electionoccurring at least 120 days after the creation of the office. * * *" (Emphasis added)
Section 59.031 (1), Stats., insofar as here applicable, provides as follows: *Page 203 
"* * * ELECTION AND TERM OF OFFICE. In each county having a population of 500,000 or more, a county executive shall be elected for a term of 4 years at the election to be held on the first Tuesday in April of each year in which county supervisors are elected, and he shall take office onthe first Monday in May following his election. * * * The first election under this section in a county presently (1959) having a population of 500,000 or more shall be held on the first Tuesday in April 1960. In any county which hereafter attains such population, such first election shall be held on the first Tuesday in April in the year following the official announcement of the federal census." (Emphasis added)
The above quoted language of sec. 59.032 (1), Stats., resulted from an amendment of that subsection by ch. 214, Laws of 1969. Said enactment generally followed recommendations submitted by the Task Force on Local Government Finance and Organization, also known as the "Tarr Task Force," created by ch. 22, Laws of 1967, for the general purpose of studying such matters as the organization and functions of local government in this State.
Government organization Report No. 6, which contained an initial draft of a bill designed to provide for a county executive and county administrator, proposed amendments to sec. 59.032, Stats., to conform that statute with the statutory provisions relating to the Milwaukee county executive, i.e., sec. 59.031, Stats. However, the proposed bill draft did not include the language which I have underlined in the above quote from sec. 59.032 (1), Stats. The language underlined is that which I assume you find confusing.
Although the county executive elected in populace counties under the provisions of sec. 59.031 (1), Stats., takes office on the first Monday in May following his election, it might be argued that sec. 59.032 (1), Stats., provides that the term of a county executive in other counties commences with his election. In my opinion, however, the above quoted language of sec. 59.032 (1), clearly indicates an intent that the term of office of a county executive begins on the same day as designated in sec. 59.031 (1), i.e., the first Monday in May following his election. *Page 204 
The words "commencing with the 1st spring election occurring at least 120 days after the creation of the office," quite clearly appears to have been subsequently added to the original Tarr Task Force bill draft of sec. 59.032 (1), Stats., to indicate when the first election for county executive would be held after the creation of the office. They were not inserted to indicate the day on which the actual term began. The phrase performs the same function as the language in sec. 59.031 (1), Stats., referring to a first election in "April 1960" or in "April in the year following the official announcement of the federal census." However, the latter language would obviously be inappropriate for counties where the determination to have a county executive is not mandatory nor solely based on population. It is apparent, therefore, that the insertion of the subject language in sec. 59.032 (1) was only intended to set the time of the first election and not the beginning of the term itself.
You next inquire as to who is responsible for making a new apportionment of your county's supervisory districts based on the 1970 census.
The provisions of sec. 59.03 (2) (b) and (c), Stats., clearly indicate that your county board is responsible for devising an apportionment plan for county supervisory districts based on the 1970 federal census.
Section 59.03 (2) (c), Stats., provides as follows:
"Apportioning supervisory districts. Following each federal decennial census the secretary of state shall certify to each county board chairman the population of each town, village and city in the county. As soon as practicable but not more than one year after receiving the population certification, the county board in each county shall apportion countysupervisor districts as provided in par. (b) and the chairman of the county board shall file a certified copy of the apportionment plan with the secretary of state." (Emphasis added)
Section 59.03 (2) (b), Stats., likewise provides, in part, as follows: *Page 205 
"Creation of supervisory districts. The county board in each countyshall establish and number supervisory districts, after a public hearing, in such a manner that each supervisor shall represent as nearly as practicable an equal number of persons, * * *." (Emphasis added)
You finally inquire whether the county executive of a county possesses the power to veto an apportionment plan established by the county board. In my opinion, this question must be answered in the affirmative.
Section 59.02 (1), Stats., relating to the manner in which the powers of a county may be exercised, provides as follows:
"The powers of a county as a body corporate can only be exercised by the board thereof, or in pursuance of a resolution or ordinance adopted by it."
In addition, however, sec. 59.032 (6), Stats., which is a statutory repetition of the constitutional veto powers of an elected county chief executive, provides that "Every resolution or ordinance passed by the county board shall, before it becomes effective, be presented to the county executive." Under the provisions of that subsection, if the county executive vetoes such resolution or ordinance, the legislation is subject to the specific proceedings on veto therein set forth.
An elected county chief executive officer with veto power is authorized by Art. IV, secs. 23 and 23A, Wis. Const. The manner in which such officer exercises his approval or disapproval of county ordinances and resolutions is strikingly similar to that prescribed in Art. V, sec. 10, Wis. Const., for gubernatorial approval or veto of bills which have passed the State Legislature. Therefore, I feel it is logical to look to past judicial treatment of the Governor's authority to veto legislative reapportionment bills as possibly determinative of the same issue in counties having an elected chief executive officer with veto power.
In State ex rel. Reynolds v. Zimmerman (1964), 22 Wis.2d 544,126 N.W.2d 551, the Wisconsin Supreme Court removed any doubt as to the authority of the Governor to *Page 206 
participate in the apportionment of State legislative districts through the exercise of his power to approve or veto bills, by confirming that right even though Art. IV, sec. 3, Wis. Const., simply provides that after each federal census "* * * the legislature shall apportion and district anew the members of the senate and assembly, according to the number of inhabitants, * * *." (Emphasis added) The specific question before the court was whether "the legislature may effect a valid reapportionment of the state's legislative districts by joint resolution, i.e., without the concurrence of the executive."
In concluding that the legislature could not act unilaterally in such a matter, the court pointed out that the Governor is given an important role in the legislative process by our constitution, that apportionment is vital to the functioning of our government, and emphasized the fact that the constitutional requirements for having out legislative districts all operate within "the overall constitutional standard of per capita equality of representation." Further, while it was recognized that Art. IV, sec. 3, Wis. Const., provides that "the legislature" shall apportion the legislative districts and does not specify that this must be accomplished by a bill subject to veto of the Governor, the court stated that "It would be unreasonable to hold that the framers of the constitution intended to exclude from the reapportionment process the one institution guaranteed to represent the majority of the voting inhabitants of the state, the governor." See 22 Wis.2d 553-559.
Finally, in addition to the judicial guidance provided in the Reynolds
case, supra, it appears that other cases may likewise have the effect of depriving the county board of the one distinction it conceivably might otherwise have argued would preclude a veto by the county executive, i.e., that the board in establishing the apportionment plan would act by verbal motion as distinguished from a resolution or ordinance. In GreenBay v. Brauns (1880), 50 Wis. 204, 6 N.W. 503, for instance, the court indicated that an oral motion adopted by the common council became a resolution or order of that body. It was later held in Meade v. Dane *Page 207 County (1914), 155 Wis. 632, 145 N.W. 239, that while in some instances and for some purposes there are fundamental distinctions between an ordinance and a resolution, the words "ordinance or resolution," in the statute there being considered, "cover all exercise of power by the county board which either may lawfully be or is exercised in the form of a resolution." Therefore, all oral motions when adopted by the county board also become resolutions of that body. See also 9 OAG 573 (1920) and 44 OAG 205 (1955).
In light of the foregoing, it appears evident that a county executive elected pursuant to sec. 59.032, Stats., possesses the power to veto an apportionment plan established by his county board under the provisions of sec. 59.03 (2), Stats.
RWW:JCM