CITY OF JANESVILLE, City of Beloit and City of Edgerton,
Plaintiffs-Respondents,

v.

COUNTY OF ROCK, Rock County Board of Supervisors,
and Gregory A. Seefeldt, Rock County Clerk,
Defendants-Appellants.

Court of Appeals

*No. 81–2241. Argued February 24, 1982.—Decided March 19, 1982.*
(Also reported in 319 N.W.2d 891.)

For the defendants-appellants there were briefs by *Victor Moyer*, corporation counsel, and *DeWitt, Sundby, Huggett & Schumacher*, of counsel, of Madison, and oral argument by *Robert D. Sundby*, of Madison.

For the plaintiffs-respondents there was a brief by *Berta S. Hoesly* of Janesville, *Daniel T. Kelley* of Beloit, and *Jeffrey T. Roethe* of Edgerton, and oral argument by *Berta S. Hoesly*, of Janesville.

Before Gartzke, P.J., Dykman, J. and Cane, J.

GARTZKE, P.J. Rock County, its board of supervisors and its clerk have appealed from the judgment of the circuit court in an action brought by the Cities of Janesville, Beloit and Edgerton, all located in Rock County. The dispute relates to the adjustment of the cities' election subdivisions (wards) and the county's supervisory districts following the 1980 federal census.

After the 1980 census, Rock County adopted a tentative plan to redraw its supervisory districts, which were last redrawn following the 1970 census. The plaintiff cities adjusted their ward boundaries to conform with that plan. The county then abandoned its tentative plan, adopted a second tentative plan and sent a letter to the cities asking that they adjust their wards to the second tentative plan. The cities commenced this action, arguing that they could not be compelled to readjust their wards a second time and that the county must adopt its original tentative plan, with minor changes.

The trial court agreed with the cities and entered a declaratory judgment requiring the county to adopt its original tentative plan. We affirm.

1. *Statutory Background*

Wisconsin law (with exceptions not pertinent to this appeal) requires cities, villages and towns with a population of 1,000 or more to establish wards following publication of the final result of the federal decennial cen-

sus.[1] Wis. Stat. Ann. sec. 5.15(1)(a) and (2)(a) (West 1981 pocket part).[2] The wards are used to form election districts of substantially equal population. Sec. 5.02(25), Stats. Municipal wards have been described as the "basic building blocks to be used by the legislature, county boards and municipal governing bodies in redistricting their respective election districts."[3]

The 1981 legislature modified the procedure for adjusting municipal wards and their use as "building blocks" by counties when adjusting supervisory districts. Prior to ch. 4, Laws of 1981, the law required the county board to adjust its supervisory districts on the basis of the municipal wards after the cities, villages and towns adjusted their wards. Thus, sec. 5.15(1)(a), Stats. 1979, required each municipality to adjust its wards within ninety days after the population count established in the decennial census became available. Section 59.03(3)(b), Stats. 1979, provided that within ninety days after every municipality in the county had adjusted its wards, the county board "shall establish . . . supervisory districts . . . in such manner that by combining contiguous whole

---

[1] Section 5.02(25), Stats., defines a "ward" as "a town, village or city subdivision created for the convenience of the electors therein and to facilitate the division of such municipalities into election districts of substantially equal population numbers along common boundaries observing the community of interest of existing neighborhoods and other settlements." The statutory context shows that county supervisory districts are formed by combining whole wards. Wis. Stat. Ann. sec. 59.03(3)(b) (West 1981 pocket part). Wards are also the components of city aldermanic districts in cities that elect their common council members by district. Wis. Stat. Ann. sec. 62.08(1) (West 1981 pocket part).

[2] References to West 1981 Pocket Part indicate statutes modified by ch. 4, Laws of 1981, which have not yet been printed in the Wisconsin Statutes.

[3] Legislative Reference Bureau, Informational Bulletin 81–1B–2, Guidelines for Establishing Municipal Wards Following the 1980 Census of Population at 1 (March 1981).

wards each [county] supervisor shall represent as nearly as practicable an equal number of inhabitants."

Chapter 4, Laws of 1981, changed this procedure. The process is now divided into three periods of sixty days each. The county board initiates the first stage by adopting a "tentative plan" for dividing the county into supervisory districts of substantially equal population, after soliciting "suggestions from municipalities concerning development of an appropriate plan." Wis. Stat. Ann. sec. 59.03(3)(b)1 (West 1981 pocket part). The municipalities must adjust their wards within the next sixty days, giving "consideration to the tentative plan" and making "a good faith effort to accommodate the tentative plan submitted by the county . . . ." Wis. Stat. Ann. sec. 5.15(1)(b) and (2)(d) (West 1981 pocket part). In the third and last stage, the county board must adopt its "final" supervisory district plan within sixty days after each municipality has adjusted its wards. Wis. Stat. Ann sec. 59.03(3)(b)2 (West 1981 pocket part).[4]

---

[4] Wisconsin Stat. Ann. sec. 59.03 (West 1981 pocket part) provides in material part:

(2) In each county having a population of at least 500,000:

(a) Within 60 days after the population count by enumeration district or block, established in the decennial federal census of population, becomes available in printed form from the federal government or is published for distribution by an agency of this state, the board shall adopt and transmit to the governing body of each city and village in the county a tentative county supervisory district plan to be considered by the cities and villages when dividing into wards. The plan shall specify the number of supervisors to be elected and shall divide the county into a number of districts equal to the number of supervisors, with each district substantially equal in population. Except as otherwise provided in this paragraph, the board shall develop and adopt the tentative plan in accordance with sub. (3)(b)1. The board shall adopt a final plan by ordinance in accordance with sub. (3)(b)2 to 4.

. . . .

## 2. *Stipulated Facts Material To Appeal*

April 13, 1981 Rock County received the population count established by the 1980 decennial census. June 11,

(3) (a) Counties having a population of less than 500,000 and more than one town . . . :

. . . .

(b) 1. Within 60 days after the population count by enumeration district or block, established in the decennial federal census of population, becomes available in printed form from the federal government or is published for distribution by an agency of this state, each board shall adopt and transmit to each municipal governing body in the county a tentative county supervisory district plan. The plan shall divide the county into districts. Each district shall be designated to be represented by one or 2 supervisors; . . . [a]ll districts designated to be represented by one supervisor shall be substantially equal in population. All districts designated to be represented by 2 supervisors shall be substantially equal in population, which population shall be approximately twice the population of each district in the county designated to be represented by one supervisor, if any. The board shall solicit suggestions from municipalities concerning development of an appropriate plan. In the tentative plan, the board shall, whenever possible, give first preference to placing whole contiguous municipalities or parts of the same municipality within the same district and 2nd preference to placing whole contiguous enumeration districts within the same district. In the event that a division of a municipality or enumeration district is sought by the board, the board shall provide with the plan a written statement to the municipality affected by each proposed division specifying the approximate location of the territory from which a ward is sought to be created for contiguity purposes and the approximate population of the ward proposed to effectuate the division.

2. Within 60 days after every municipality in the county adjusts its wards under s. 5.15, the board shall hold a public hearing and thereafter adopt a final supervisory district plan, numbering each district. Wards within each supervisory district created by the plan shall be contiguous. . . .

. . . .

(c) After the enactment of a plan of supervisory districts under par. (b), a municipal incorporation, annexation, detachment or consolidation may serve as a basis for altering between federal

1981 the county board adopted a tentative plan fixing the boundaries of its supervisory districts and submitted

decennial censuses the boundaries of supervisory districts, in the discretion of the county board. The number of supervisory districts in the county shall not be changed by any action under this paragraph. Any plan of county supervisory districts enacted under par. (b) may be amended under this paragraph but shall remain in effect as amended until superseded by another plan enacted by the county board under said paragraph and filed with the secretary of state.

Wisconsin Stat. Ann. sec. 5.15 (West 1981 pocket part) provides in material part:

(1) (a) Every city, village or town. in this state shall by its common council or village or town board, respectively, be divided into wards as provided in this section. . . . The boundaries of the wards established under this section, and the number assigned to each ward, are intended to be as permanent as possible. . . . Once established, the boundaries of each ward shall remain unchanged until a further decennial federal census of population indicates that the population of a ward is then above or below the applicable population range. . . .

(b) Except as authorized in sub. (2) (a), within 60 days after the receipt of a tentative supervisory district plan and written statement, if any, from the county board of each county in which a municipality is located, the governing body of the municipality shall adjust its wards according to the schedule shown in sub. (2). Except as authorized in sub. (2), each ward shall consist of whole enumeration districts or, where block statistics are available for blocks, of whole blocks. To suit the convenience of the voters residing therein each ward shall, as far as practicable, be kept compact and observe the community of interest of existing neighborhoods and other settlements. The division of a municipality into wards shall be made by the common council for each city, by the village board for each village, and by the town board for each town. In dividing the municipality into wards, the governing body shall give consideration to the tentative plan submitted by the county board of the county or counties in which it is located under s. 59.03(2)(a) or (3)(b)1. . . .

(2) . . .

. . . .

(d) Every municipality shall make a good faith effort to accommodate the tentative plan submitted by the county or counties

the plan to the cities. Each city subsequently redrew its ward boundaries by ordinance to satisfy statutory requirements and to conform to the county's tentative plan. Each city forwarded its plan to the county. All other municipalities in Rock County required to adopt new ward boundaries did so and forwarded their plans to Rock County. The adjustment of wards was completed September 21, 1981.

October 8, 1981 the Rock County Board defeated a resolution which would have adopted a final plan estab-

in which it is located under s. 59.03(2)(a) or (3)(b)1, and shall divide itself into wards in such a manner that will permit the creation of county supervisory districts in accordance with the population requirements for the plan specified in s. 59.03(2)(a) or (3)(b)1. If the use of whole enumeration districts prevents the establishment of county supervisory districts in accordance with the tentative plan, the municipality shall cooperate with the county or counties in which it is located to divide itself into wards which will permit the creation of supervisory districts in accordance with the population requirements for the plan specified in s. 59.03 (2)(a) or (3)(b)1. . . .

. . . .

(3) If any municipality fails to comply with this section, the county in which the municipality is located or any elector residing in the municipality may submit to the circuit court for the municipality within 14 days from the expiration of the 60 day period under sub. (1)(b) a proposed plan for the division of the municipality into wards in compliance with this section. If the circuit court finds that the existing division of the municipality into wards fails to comply with this section, it shall review the plan submitted by the petitioner and may promulgate it, or any other plan in compliance with this section, as a temporary ward plan for the affected municipality to remain in effect until superseded by a ward plan adopted by the governing body in compliance with this section.

. . . .

(6)(a) Following any municipality-wide special federal census of population, the governing body of the municipality in which the special census was held may adjust the ward boundaries, but no ward line adjustment may cross the boundary of an assembly district. . . .

lishing supervisory districts based on the plan tentatively adopted June 11, 1981. October 22, 1981 the Rock County Board established a new tentative plan.[5] The new plan does not include and utilize the readjusted ward boundaries adopted by the plaintiff cities. It contains supervisory districts that are not contiguous with the newly adopted ward boundaries of each plaintiff or with the newly adopted aldermanic districts of Edgerton.[6]

October 23, 1981 the Rock County clerk wrote to the clerks of the plaintiff cities and several other municipalities in the county. The letter states that October 22 the county board adopted a new tentative plan, encloses a map showing the new districts and states that the recipient municipality "has until November 12, 1981 to review the tentative plan and to create voting wards which would accommodate" the new plan. The letter states that the county board "ask[s]" the municipality to create voting wards in accordance with the map. It concludes, "We ask your cooperation in this matter and if your municipality is not going to comply with this

---

[5] The record contains letters from the Wisconsin County Boards Association to a county board member. The letters state that a county cannot require municipalities to create new wards after adjusting wards in compliance with the tentative plan and cannot start the redistricting process over and redo the tentative plan. The letters were included in the appendix to the cities' trial court brief. The stipulation does not embrace the letters. We have not taken the letters into account.

[6] The law requires cities to redraw the boundaries of their aldermanic districts on the basis of their new ward plans. Wis. Stat. Ann. sec. 62.08(1) (West 1981 pocket part). The stipulation of facts reflects that Edgerton created new aldermanic districts September 8, 1981, by combining wards adopted under the county's original tentative plan. Under this plan the City of Edgerton's six wards would have constituted a single supervisory district.

The stipulation of facts does not mention aldermanic districts in Janesville or Beloit. Appellant states that these cities elect their city council members at large.

request, please contact the County Planning Office in writing by November 10, 1981."

3.  *Judicial Relief Available*

The county asserts that, in the absence of an abuse of discretion, fraud or arbitrary action, the judiciary cannot compel a legislative body such as a county board to adopt or refrain from adopting particular reapportionment legislation. The contention misses the mark. The issue is whether judicial relief is available if a county fails to follow the statutory requirements for redistricting. We hold that judicial relief is available.

The judiciary can grant relief from an invalid legislative apportionment or the legislature's failure to apportion. Thus, if the legislature enacts an apportionment contrary to the state constitution, "then it is the duty of the courts to hold the same unconstitutional." *State ex rel. Reynolds v. Zimmerman*, 22 Wis. 2d 544, 562, 126 N.W.2d 551, 561–62 (1964), quoting *State ex rel. Broughton v. Zimmerman*, 261 Wis. 398, 413, 52 N.W.2d 903, 910 (1952). When the legislature failed to adopt and execute a final plan of apportionment which conformed to art. IV, sec. 3 of the Wisconsin Constitution, the supreme court of this state granted affirmative judicial relief in the form of an apportionment plan. *State ex rel. Reynolds*, 23 Wis. 2d 606, 128 N.W.2d 16, 349, *enforcing* 22 Wis. 2d 544, 571, 126 N.W.2d 551, 566 (1964).

The judiciary has granted relief on the county level when representation on the board of supervisors was constitutionally inadequate. *State ex rel. Sonneborn v. Sylvester*, 26 Wis. 2d 43, 56–57, 132 N.W.2d 249, 256 (1965). The *Sonneborn* court declared that sec. 59.03 (2), Stats. 1963, establishing the composition of county

boards, was unconstitutional because it did not adequately consider population.[7]

The *Sonneborn* court noted that "the legislature in ch. 59, Stats., has granted a substantial bundle of legislative powers to county boards and may grant additional substantial powers." 26 Wis. 2d at 56, 132 N.W.2d at 256. The court reasoned that since the composition of the legislature must conform to the principle of equal representation, the composition of an elected county board empowered to enact local legislation must conform to the same principle. 26 Wis.2d at 57, 132 N.W.2d at 256. The court ordered that if a system of county government in accordance with constitutional standards was not provided, application could be made to the court for "appropriate relief." 26 Wis. 2d at 62, 132 N.W.2d at 258.

If the courts can compel the legislature to provide adequate representation on the state or county level, then certainly the courts can compel a county to follow the districting procedure mandated by the legislature for achieving adequate representation.

Counties have an absolute duty to establish supervisory districts as directed by the legislature. That Wis. Stat. Ann. sec. 59.03(3)(b) (West 1981 pocket part) imposes mandatory action on the county in the first and third stages in the formation of supervisory districts is not questioned. Our supreme court has "reaffirmed the principle that counties are creatures of the Legislature and their powers must be exercised within the scope of authority ceded to them by the state . . . ." *Dane County v. H&SS Dept.*, 79 Wis. 2d 323, 329–30, 255 N.W.2d 539, 543 (1977).

---

[7] Section 59.03(2), Stats. 1963, provided that in counties having a population of less than 500,000 and more than one town, the board of supervisors consisted of elected officials in the towns, villages and cities, rather than being representative on the basis of population.

In governmental matters, the county is simply the arm of the state; the state may direct its action as it deems best and the county cannot complain or refuse to obey. *McDougall v. Racine County*, 156 Wis. 663, 146 N.W. 794 (1914). *Madison Metropolitan Sewerage District v. Committee on Water Pollution*, 260 Wis. 229, 50 N.W.2d 424 (1951).

79 Wis. 2d at 330, 255 N.W.2d at 543.

How the county divides its supervisory districts is not subject to inquiry on this appeal. The specific number of supervisory districts to be established by the county is of no concern to the judiciary in this action. The propriety or wisdom of dividing the county into any particular number of supervisory districts is not before us.

The circuit court enjoined the county to adopt a supervisory district plan based on the county's original tentative plan. The trial court granted that relief, not to compel the county to redistrict in a specific way, but to compel adoption of a final plan based on the original tentative plan. Hence, the relief granted by the trial court did not encroach upon a legislative function.

4. *Justiciable Controversy As To Redistricting Plan*

In its oral decision the circuit court held that the county board had no authority, in the court's words, to "require municipalities to redraw ward boundaries to accommodate a new tentative plan." Accordingly, the court concluded that the county's new tentative plan was unlawful. The court said in its oral decision that even if the new plan were to become a final plan, it would be unlawful because it does not include and utilize ward boundaries adopted by each of the plaintiffs. The judgment, however, does not contain such a declaration.

The county contends that the court erred because it rendered an advisory opinion on a proposed reapportionment which had not been accomplished. The county as-

serts that no controversy exists because the county clerk's letter merely asked the cities to create new wards to accommodate the new plan.

The existence of "a justiciable controversy—that is to say, a controversy in which a claim of right is asserted against one who has an interest in contesting it," is a condition precedent to a declaratory judgment action. *Tooley v. O'Connell*, 77 Wis. 2d 422, 433, 253 N.W.2d 335, 340 (1977), quoting *State ex rel. La Follette v. Dammann*, 220 Wis. 17, 22, 264 N.W. 627, 629 (1936). A justiciable controversy requires the existence of present and fixed rights. A declaratory judgment will not determine hypothetical or future rights. *Tooley*, 77 Wis. 2d at 434, 253 N.W.2d at 340. Courts will not render merely advisory opinions. *La Follette*, 220 Wis. at 22, 264 N.W. at 629.

The oral decision constitutes the circuit court's findings of fact and conclusions of law. We read the decision to include a factual finding that the county board has attempted to require the cities to redraw their wards. That finding is the only reasonable inference from the undisputed facts. The county had previously abolished its tentative plan, on the basis of which the cities had adjusted their wards in the second stage of the redistricting and re-warding process. The county's conduct contradicts the diplomatic language of its clerk's letter to the cities. The county's action is consistent only with a requirement that the cities adjust their wards a second time, because those wards were tailored to a redistricting plan which no longer exists.

The county consequently shows by its conduct that it claims the right to require the cities to adjust their wards a second time. We conclude later in this opinion that the

cities have an interest in refusing to do so. A controversy therefore exists. *Tooley, supra.*

That controversy includes the lawfulness of the second tentative district plan. That is the only plan now before the municipalities and was a fit subject for relief granted by the declaratory judgment.

The judgment does not declare hypothetical or future rights. The circuit court's oral pronouncement on the unlawfulness of the county's second tentative plan if adopted as a final plan is not part of the judgment. The appeal is from the judgment, not the oral decision. The declaratory judgment does not render an advisory opinion.

5. *Cities' Standing*

The county contends that the cities are not entitled to declaratory relief because they lack a legal interest in the controversy and therefore lack standing to challenge the county's redistricting plan. A legal interest in contesting a claim of right is a condition precedent to maintaining an action for declaratory relief. *Tooley,* 77 Wis. 2d at 433, 253 N.W.2d at 340. To have standing, the cities must show a direct effect on their legally protected interests. *Trojan v. Board of Regents,* 104 Wis. 2d 277, 286, 311 N.W.2d 586, 590 (1981).

The county claims the right to require cities to readjust their wards after the cities have already done so. The cities acted pursuant to Wis. Stat. Ann. sec. 5.15 (West 1981 pocket part). A municipality has an interest in maintaining the wards it has created or adjusted as required by statute. The interest is inherent in the right of the municipality to perform the duties imposed upon it by the legislature without interference from other persons.

It is self-evident that every person, whether natural or a body politic, must perform its lawful duty. It fol-

lows that a person generally has a right to perform a lawful duty without interference from others. Just as the law will generally compel a person to perform a duty, so the law should protect the person from interference with that performance.

Municipalities, like counties, have an absolute duty to perform as directed by the legislature in the three-stage process required by Wis. Stat. Ann. secs. 5.15 and 59.03 (West 1981 pocket part). Section 5.15(1)(a) provides in relevant part, "Every city, village or town in this state *shall* by its common council or village or town board, respectively, be divided into wards as provided in this section." (Emphasis added.) Section 5.18(1) refers to the division into wards under sec. 5.15 as "imperative."

For the cities to readjust their wards to accommodate the county's second tentative plan would constitute a violation by the cities of Wis. Stat. Ann. sec. 5.15 (West 1981 pocket part) in two respects:

First, the cities are not free to readjust their wards from time to time. Wisconsin Stat. Ann. sec. 5.15(1)(a) (West 1981 pocket part), not only requires every municipality to divide into wards but further provides, "Once established, the boundaries of each ward shall remain unchanged until a further decennial federal census of population indicates that the population of a ward is then above or below the applicable population range." The same subsection permits subsequent division of a ward or combining the ward with an adjoining ward under conditions which are not present here.

Second, the three-stage process envisioned by Wis. Stat. Ann. secs. 5.15 and 59.03 (West 1981 pocket part) contemplates redistricting and ward adjustment according to a time schedule initiated by availability of the results of the federal decennial census. Adherence to that time schedule is mandatory. Indeed, if a municipality fails to adjust its wards within the sixty-day period allowed un-

der sec. 5.15(1)(b), subsec. (3) authorizes the circuit court to promulgate a plan in compliance with sec. 5.15 "as a temporary ward plan for the affected municipality to remain in effect until superseded by a ward plan adopted by the governing body in compliance with this section." The sixty-day period in which the plaintiff cities were required to adjust their awards had expired when the county attempted to restart the process with a second tentative plan.

Accordingly, we conclude that the cities have a legally protected interest at stake in the controversy between the cities and the county. That interest is directly affected by the action of the county. The cities therefore have standing. *Trojan, supra; Tooley, supra.*

6. *Justiciable Controversy As To Cities' Rights To Keep Ward Boundaries As Drawn Under Original Tentative Plan*

The county's last contention is that the controversy will ripen with respect to the county's second plan only if the cities refuse to redraw their wards and the county commences an action under Wis. Stat. Ann. sec. 5.15(3) or 5.18 (West 1981 pocket part). Declaratory judgment is unavailable unless the issue is ripe for judicial determination. *Tooley,* 77 Wis. 2d at 434, 253 N.W.2d at 340. The "ripeness" doctrine saves courts from entanglement in abstract disagreements through premature adjudication. *Lister v. Board of Regents,* 72 Wis. 2d 282, 309, 240 N.W.2d 610, 625 (1976).

The issue is ripe for judicial determination. The disagreement between the county and the cities is based upon present facts. The issue is whether, having already adjusted their wards to meet one county tentative plan, the cities must again readjust their wards to meet a second tentative plan. That is not an abstract or future issue. Immediate judicial relief will resolve it.

The county has offered no reason why judicial resolution of the issue must await an action by the county against the cities. We have resolved the issue in favor of the cities.

7. *1982 Spring Election*

The circuit court granted a stay, pending appeal, of the injunction requiring the county to adopt its original tentative plan as the final plan. The court ordered the 1982 spring elections to be based upon the newly adopted municipal ward boundaries and upon the already existing supervisory district plan which was drawn after the 1970 census. The court ordered the county to pay expenses incurred by the cities from holding the elections under the old supervisory districts.

The cities assert that if the 1982 spring election is carried out as ordered, the old plan will remain in place and those supervisors will remain in office for another two years. The cities contend we should cancel the spring election. They propose we promulgate a long and complex timetable preliminary to holding the Rock County supervisory elections at the 1982 fall elections. They request that we retain jurisdiction and order the trial court to adopt a redistricting plan.

We need not decide whether the relief sought by the cities on appeal exceeds that which the court of appeals may grant under the constitution and sec. 808.09, Stats.[8]

---

[8] Article VII, sec. 5(3) of the Wisconsin Constitution provides that the court of appeals has "such appellate jurisdiction in the district . . . as the legislature may provide by law, but shall have no original jurisdiction other than by prerogative writ. The appeals court may issue all writs necessary in aid of its jurisdiction and shall have supervisory authority over all actions and proceedings in the courts in the district."

Section 808.09, Stats., provides in material part that upon an appeal from a judgment or order, "an appellate court may reverse, affirm, or modify the judgment or order as to any or all of the parties."

We must follow the precedents established by the Wisconsin Supreme Court. In an original action in which it declared that the composition of the county boards as mandated by sec. 59.03(2), Stats. 1963, was unconstitutional, the supreme court declined to stay the April 1965 elections to avoid interfering with the "orderly operation of government." *State ex rel. Sonneborn,* 26 Wis. 2d at 60–61, 132 N.W.2d at 257–58.

Utilizing the new wards which do not accommodate the ten year old supervisory districts will cause considerable inconvenience in the spring elections. However, orderly government in Rock County probably would be more disrupted by the complexities of canceling the spring elections than by holding the elections as the court ordered. We do not ignore the undesirability of an election for county supervisors based upon outmoded districts. It is impossible at this point to weigh that factor against the disruption which a new election date would cause.

The circuit court need not be ordered to adopt a redistricting plan. The circuit court enjoined the defendants to adopt a plan based upon the original tentative plan, and we affirm that judgment.

We do not cancel the 1982 spring election for Rock County supervisors, retain jurisdiction, or order the circuit court to adopt a redistricting plan.

*By the Court.*—Judgment affirmed.