Kerry L. Putnam, Carol L. Smith-Carter and Louis Boutan, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,†

v.

Time Warner Cable of Southeastern Wisconsin, Limited Partnership, Defendant-Respondent.

Court of Appeals

*No. 99–2078. Oral argument March 15, 2001.—Decided July 3, 2001.*

## 2001 WI App 196

(Also reported in 633 N.W.2d 254.)

† Petition to review granted 10-23-01.

42

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *John C. Cabaniss* of *Law Office of John C. Cabaniss* of Milwaukee, with oral argument by *John J. Carey* of *Carey & Danis, LLC*, of Clayton, Missouri.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Robert H. Friebert* of *Friebert, Finerty & St. John, S.C.*, of Milwaukee, with oral argument by *Robert H. Friebert*.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. CURLEY, J. Kerry L. Putnam, Carol L. Smith-Carter, and Louis Boutan, individually and on

behalf of a putative c lass of customers (collectively, "the customers"), of Time Warner Cable of Southeastern Wisconsin, Limited Partnership (Time Warner), appeal from the circuit court judgment dismissing their action against Time Warner. The customers argue that the circuit court erred in concluding that the "voluntary payment doctrine" precluded their action to: (1) recover the amount of monthly late-fee payments they made that was not reasonably related to Time Warner's actual costs; and (2) obtain declaratory and injunctive relief preventing Time Warner from imposing such fees in the future.

¶ 2. We conclude that the circuit court correctly applied the voluntary payment doctrine when dismissing the customers' claims for recovery of late-fee payments in excess of Time Warner's actual costs. We also conclude that the circuit court correctly dismissed the customers' request for declaratory and injunctive relief. Accordingly, we affirm.

## I. BACKGROUND.

¶ 3. The customers brought an action to recover actual, compensatory, and statutory damages for a portion of a $5.00 monthly late fee that, they claim, is not reasonably related to Time Warner's actual costs, and for declaratory and injunctive relief to prevent Time Warner from imposing such fees in the future.[1] The amended complaint specifically alleged that upon

---

[1] The amended complaint claimed the following grounds for relief: (1) unlawful liquidated damages; (2) unconscionability; (3) breach of implied covenants of good faith and fair dealing; (4) unjust enrichment; (5) restitution; (6) money had and received; (7) violation of Wisconsin's trade practice statutes; (8) equitable accounting; and (9) declaratory and injunctive relief. The customers present separate arguments challenging the

"installation and/or other activation" of cable television service, Time Warner's customers were required to execute a form contract requiring them to prepay for the first month of cable service, and that Time Warner imposes a $5.00 late fee on all customers who fail to pay their cable television bills by the due date set by Time Warner. Further, the amended complaint alleged:

> Time Warner's late fee: (1) does not, in fact, bear a reasonable relationship to the costs incurred by Time Warner solely as a result of the late payments and/or late paying customers; and (2) is not based on a reasonable advanced estimate of the cost of late payments and/or late paying customers.

Moreover, the amended complaint alleged that Time Warner's collection of late fees amounted to a double recovery because it had already incorporated the collection costs into its basic cable rates, which the Federal Communications Commission had approved.

¶ 4. Finally, the amended complaint alleged that Time Warner customers paying late fees did so "under duress and the real and imminent threat that Time Warner, a monopolist for cable television programming in its exclusive Wisconsin territories, would disconnect the cable television services of a late paying customer." The amended complaint concluded that the customers, "[i]n reliance on [Time Warner's] concealments, suppressions, and omissions . . . paid at least one excessive

---

circuit court's dismissal of both the claim for unlawful liquidated damages and the claim for declaratory and injunctive relief. However, they present a unified argument challenging the dismissal of all their other claims. Accordingly, the three sections of our discussion derive from the three-part organization of the appellants' challenge to the circuit court's decision.

and unconscionable late fee to Time Warner and continue to be threatened with paying additional excessive late fees to Time Warner."

¶ 5. Time Warner moved to dismiss all of the customers' claims, arguing that they were precluded either by the voluntary payment doctrine or by failure to state a claim for which relief may be granted. Opposing the motion to dismiss, the customers maintained that the voluntary payment doctrine was inapplicable because they did not have knowledge of all the facts relevant to the late-fee charges as a result of Time Warner's fraudulent and deceptive omission or concealment of those facts, and because they did not have a meaningful opportunity to contest the late fees. Rejecting the customers' arguments, the circuit court agreed that the voluntary payment doctrine barred their claims to recover past payments. The court also concluded that the claim for declaratory and injunctive relief was not ripe for resolution because the amended complaint failed to allege that any customer had refused to pay a late fee.

¶ 6. On appeal, the customers argue that the circuit court erred in concluding that the voluntary payment doctrine applied to this case. They also argue that even if, in theory, the doctrine could apply, it would not preclude their claims to recover past payments because Time Warner's deceptive conduct rendered the doctrine inapplicable. Finally, they argue that the circuit court erred in denying declaratory and injunctive relief.

## II. Discussion.

¶ 7. The standard for reviewing whether a circuit court correctly dismissed an action is well known. As recently reiterated by the supreme court:

"A motion to dismiss a complaint for failure to state a claim tests the legal sufficiency of the complaint." Whether the complaint states a claim for relief is a question of law which [an appellate court] reviews *de novo*. For purposes of review, we must accept the facts stated in the complaint, along with all reasonable inferences which may be drawn from them, as true. Unless it seems certain that no relief could be granted under any set of facts that the plaintiff could prove, dismissal of the complaint is improper.

*Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245, 593 N.W.2d 445 (1999) (citations omitted).

A. *Voluntary payment doctrine.*

██

¶ 8. The voluntary payment doctrine provides that "as between [person] and [person], money paid voluntarily, with knowledge of all the facts, and without fraud or duress, cannot be recovered merely on account of ignorance or mistake of the law." *Frederick v. Douglas County*, 96 Wis. 411, 423, 71 N.W. 798 (1897). The doctrine has been applied in several diverse contexts to preclude actions to recover payments that parties paid voluntarily, with full knowledge of the material facts, and absent fraud or wrongful conduct inducing payment. *See, e.g., Burgess v. Commercial Nat'l Bank of Appleton*, 144 Wis. 59, 65, 128 N.W.2d 436 (1910); *see also Gage v. Allen*, 89 Wis. 98, 61 N.W. 361 (1894); *G. Heileman Brewing Co. v. City of LaCrosse*, 105 Wis. 2d 152, 312 N.W. 2d 875 (Ct. App. 1981).

¶ 9. The customers argue that because the doctrine only applies where the payor has full knowledge of all relevant facts supporting the charge and the payee has not committed fraud or other improper conduct to gain the payment, certain "specific factual allegations"

in the amended complaint "render the voluntary payment doctrine inapplicable under Wisconsin law." They maintain that the claims should not have been dismissed because the amended complaint alleged: (1) they paid the $5.00 late fee without knowledge that Time Warner's actual late-fee costs were between $0.38 and $0.48; (2) Time Warner concealed material information regarding its late-payment costs; and (3) they had no choice but to pay in order to maintain their cable service. We conclude, however, that the circuit court correctly determined that regardless of the truthfulness of the customers' assertions, the voluntary payment doctrine precluded their claims for recovery of late-fee payments in excess of Time Warner's actual costs. We do so for five reasons.

¶ 10. First, although the amended complaint alleged that Time Warner concealed information about the specific factors affecting the setting of the late-fee charge, it failed to allege anything that would establish Time Warner's *duty* to disclose such information. Generally, tort liability for fraudulent misrepresentation or concealment does not arise from a failure to disclose information, absent a duty to disclose that information. *See Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, ¶ 33, 234 Wis. 2d 1, 608 N.W.2d 331, *aff'd,* 2001 WI 23, 241 Wis. 2d 700, 623 N.W.2d 739; *see also Hennig v. Ahearn,* 230 Wis. 2d 149, 167, 601 N.W.2d 14 (Ct. App. 1999) ("Whether one has a duty to disclose a fact in a particular set of circumstances is essentially a policy decision, and it is, therefore, properly decided as a question of law."), *review denied,* 230 Wis. 2d 273, 604 N.W.2d 571 (Wis. Oct. 29, 1999). We conclude Time Warner had no duty to advise the customers of the company's reasons utilized in setting its late fee amount

and payment schedule. Therefore, although the company's reasons were unknown to the customers, since they had no entitlement to the information, the customers knew all the material facts available to them.

██

¶ 11. Second, the amended complaint did not allege that the fraudulent misrepresentation or concealment was material to the customers' decisions to pay the late fees. If the customers never considered the propriety of the late fees before paying them, they certainly did not pay the fees as a result of any fraudulent misrepresentation or concealment. Under such circumstances, the alleged misrepresentation or concealment could not have been material to their decision to pay. *See First Nat'l Bank & Trust Co. of Racine v. Notte*, 97 Wis. 2d 207, 222–23, 293 N.W.2d 530 (1980) ("A misrepresentation is material if it is likely to induce a reasonable person to manifest his assent, or if the maker knows that it is likely that the recipient will be induced to manifest his assent by the misrepresentation."); *see also Korhumel Steel Corp. v. Wandler*, 229 Wis. 2d 395, 403, 600 N.W.2d 592 (Ct. App. 1999), *review denied*, 2000 WI 2, 231 Wis. 2d 374, 607 N.W.2d 291.

██

¶ 12. Third, even assuming that the Time Warner customers considered whether the late fee payment was fair or wondered if it had been properly set, they still paid. Thus, at most, they paid not because of a mistake of fact resulting from Time Warner's misrepresentation or concealment of information, but because of a mistake of law regarding whether Time Warner was legally entitled to charge the $5.00 late fee.[2] Therefore, while

---

[2] The supreme court defined "mistake of fact" as " '[a]n unconscious ignorance or forgetfulness of the existence or

their late-fee payments may reflect a mistake of law, they do not reflect a mistake of fact that could defeat application of the voluntary payment doctrine. *See Sorce v. Rinehart*, 69 Wis. 2d 631, 638, 230 N.W.2d 645 (1975) (mistake of law provides no relief from contractual obligations); *Heileman*, 105 Wis. 2d at 162 (explaining that where payment of taxes is based on mistake of fact, not mistake of law, payment is not voluntary and the voluntary payment doctrine would not apply); *see also Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Employees of Am. v. Danielson*, 24 Wis. 2d 33, 36, 128 N.W.2d 9 (1964) ("A party who has expended money by mistake of fact may ordinarily recover such sum in an action for money had and received.").[3]

nonexistence of a fact, past or present, material to the contract.' " *Kowalke v. Milwaukee Elec. Ry. & Light Co.*, 103 Wis. 472, 476, 79 N.W. 762 (1899) (citation omitted). The supreme court also explained that, by contrast, a "mistake of law" happens "when a party, having full knowledge of the facts, comes to an erroneous conclusion as to their legal effect. It is a mistaken opinion or inference, arising from an imperfect or incorrect exercise of the judgment, upon facts as they really are . . . ." *Hurd v. Hall*, 12 Wis. 125, 138 (1860).

[3] The customers' mistake, if it was a mistake at all, may have been one resulting from what could be termed *conscious ignorance* – an ignorance inevitably present in myriad situations in which people simply have no desire, incentive or need to know details that might alter their view of the fairness of a transaction. *Cf. George J. Meyer Mfg. Co. v. Howard Brass & Copper Co.*, 246 Wis. 558, 568–69, 18 N.W.2d 468 (1945) (discussing unconscious ignorance). RESTATEMENT (SECOND) OF CONTRACTS § 154 cmt. c (1979) explains:

> *Conscious ignorance.* Even though the mistaken party did not agree to bear the risk, he may have been aware when he made the contract that his knowledge with respect to the facts to which the

¶ 13. Fourth, the customers failed to establish fraud or mistake. Although the customers identified the information Time Warner allegedly concealed or misrepresented, we have already concluded that they failed to allege that Time Warner had a duty to disclose this information to them. As set forth above, tort liability for fraudulent misrepresentation or concealment does not arise absent a duty to disclose. *See Miller Brewing Co.*, 2000 WI App 48 at ¶ 33; WIS. STAT. § 802.03(2).[4] Therefore, the customers failed to establish that they paid the late fee as a result of fraud or mistake perpetrated by Time Warner.

¶ 14. And fifth, to establish that payment was made due to economic duress, a payor must prove "by clear, satisfactory and convincing evidence, that there was a wrongful or unlawful act or threat that deprived [the payor] of his [or her] unfettered will." *Pope v. Ziegler*, 127 Wis. 2d 56, 60, 377 N.W.2d 201 (Ct. App. 1985). While alleging that they had no choice but to pay the late fees lest they lose their cable service, the customers provide no authority to support the proposition that what they perceived as Time Warner's threat to terminate their cable service rises to the level of economic duress as a matter of law. As valued as cable

---

mistake relates was limited. If he was not only so aware that his knowledge was limited but undertook to perform in the face of that awareness, he bears the risk of the mistake. It is sometimes said in such a situation that, in a sense, there was not mistake but "conscious ignorance."

[4] WISCONSIN STAT. § 802.03(2) provides: "FRAUD, MISTAKE AND CONDITION OF MIND. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

television may be to some customers, no authority supports the argument that its loss for failure to pay a $5.00 late fee constitutes coercion so as to defeat the voluntary payment doctrine. *See Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1332–33 (Ill. App. Ct. 1995) ("[W]e question whether cable service is a necessity such that the loss or threatened loss thereof could ever furnish the motive for payment under compulsion or economic duress."); *see also Hassen v. Mediaone of Greater Fla., Inc.*, 751 So. 2d 1289, 1290 (Fla. Dist. Ct. App, 2000) ("[P]ayment should ordinarily be deemed voluntary unless the circumstances present some constraint or compulsion of such a degree as to impose a necessity of payment sufficient to overcome the mind and will of a person of ordinary firmness."); *Telescripps Cable Co. v. Welsh*, 542 S.E.2d 640, 643 (Ga. Ct. App. 2000) (cable television subscriber's claim for recovery of late-fee payments barred by voluntary payment doctrine); *Time Warner Entmt't Co. v. Whiteman*, 741 N.E.2d 1265, 1272 (Ind. Ct. App. 2001); *McWethy v. Telecomms., Inc.*, 988 P.2d 356, 358 (Okla. Civ. App. 1999).

### B. *Unlawful Liquidated Damages*

¶ 15. The customers separately alleged that the late fee constituted unlawful liquidated damages. Their claim incorporated the amended complaint's extensive general allegations and, further, specifically alleged:

> Time Warner considers a customer's late payment to be a breach of the contract between the parties.

> The late fee provision of the contract is a liquidated damages provision purporting to be a reasonable advance estimate of the actual damages caused by the late payment breach.

. . . .

Moreover, the $5.00 late fee assessed against Plaintiffs and the other Class Members who fail, or failed, to pay their bills within the period arbitrarily selected by Time Warner, does not represent any reasonable endeavor by Time Warner to calculate a fair, average compensation for any average loss (i.e., costs) that might be caused by late payments.

Time Warner made no written cost calculations or estimates on or before the time its late fee amount was set.

Time Warner has never made an accurate and fair written cost calculation or estimate to determine whether the late fee amount is a reasonable estimate of the actual cost caused by a late payment.

The $5.00 late fee charged by Time Warner is wholly unrelated to the actual loss suffered by Time Warner as a result of a late paying customer which, on information and belief, is between $0.38 and $0.48 per late paying customer per month.

The late fee amount was not bilaterally endorsed and was not determined as the result of any arms-length negotiation between Time Warner and its customers.

Rather, Time Warner, a monopolist for cable television programming in its exclusive Wisconsin territories, unilaterally imposed, through adhesion contracts, a penalty on Plaintiffs and the Class for "breaching" their respective contracts by paying "late."

Because this penalty, disguised as an administrative charge for late payments, is not reasonably related to the actual or anticipated loss incurred by Time Warner as a result of late payment, it is an illegal

55

liquidated damages provision under common law and is void as a matter of public policy.

> Plaintiffs and the Class Members have each paid late fees to Time Warner that were not reasonably related to Time Warner's actual costs. Accordingly, Plaintiffs and the Class Members are entitled to recover actual damages representing the excessive and unlawful portion of the late fees, and interest thereon, already paid to Time Warner.

The customers note that the circuit court, in reviewing the sufficiency of the amended complaint, was required to accept its allegations as true.[5] They argue, therefore, that the court erred in dismissing the claim for unlawful liquidated damages because "[n]otwithstanding that dispute [over the actual costs related to late fees], it is illegal under Wisconsin law for any party to a contract to charge liquidated damages or penalties—such as the late fees at issue in this case—which are not reasonably related to the aggrieved party's actual damages."

¶ 16. In order to clarify this issue, at oral argument we directed the parties to address the following question:

> If the customers' claims for unconscionability, breach of implied covenants of good faith and fair dealing, unjust enrichment, restitution, money had and received, violation of Wisconsin's trade practice statutes, and equitable accounting are precluded under the

---

[5] The record establishes that the circuit court did so. Discussing the sufficiency of the amended complaint, the court commented that "we have to assume that [the $5.00 late fee is] liquidated damages," and "we have to assume that . . . the real cost is really about 48 cents, and that there's a reasonable likelihood these are unreasonable and unconscionable liquidated damages."

voluntary payment doctrine, is the customers' claim for unlawful liquidated damages also precluded on the same basis?

We further directed the parties to address "whether and to what extent *Wassenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983) relates to this question." We now conclude that, despite certain significant factors distinguishing the customers' unlawful-liquidated-damages claim from the other claims, the unlawful-liquidated-damages claim also was properly dismissed by virtue of the customers' voluntary payments.

¶ 17. "[L]iquidated damages provided in a contract must be reasonable to be enforceable." *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 294, 187 N.W.2d 200 (1971); Wis. Stat. § 402.718(1);[6] *see also Telescripps*, 542 S.E.2d at 642. The validity of a liquidated-damages clause presents a question of law. *See Wassenaar*, 111 Wis. 2d at 523. As the supreme court has clarified, however:

> The trial court's decision that a clause is or is not valid involves determinations of fact and law and will be reviewed as such. The reviewing court will uphold the factual determinations underlying its legal conclusion unless they are contrary to the great weight and clear preponderance of the evidence. Whether the facts fulfill the legal standard, here reasonableness, is a determination of law, and ordinarily the appellate court

---

[6] Wisconsin Stat. § 402.718(1), provides:

Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

need not defer to the trial court's determination of a question of law. Nevertheless, because the trial court's legal conclusion, that is, whether the clause is reasonable, is so intertwined with the factual findings supporting that conclusion, the appellate court should give weight to the trial court's decision, although the trial court's decision is not controlling.

*Id.* at 525 (citations omitted).

¶ 18. Time Warner maintains that consideration of the *Wassenaar* standards would be premature; that is, that the standards do not come into play in the instant case because application of the voluntary payment doctrine obviates the need for any further factual determination of the reasonableness of the liquidated damages. In other words, Time Warner argues that even if an unlawful-liquidated-damages claim could be legally sufficient, here it is not because the customers never refused to pay their late fees.

¶ 19. Thus, while not disputing the customers' premise that the $5.00 late fee may constitute liquidated damages, Time Warner argues that dismissal of the claim for unlawful liquidated damages was still proper under the voluntary payment doctrine. Time Warner also argues that the customers' claims for unlawful liquidated damages were properly dismissed because their claims are not an affirmative cause of action, but rather, a defense. *See Horne v. Time Warner Operations, Inc.,* 119 F. Supp. 2d 624, 630 (S.D. Miss. 1999) (where the court, confronting claims comparable to those in the instant case, accepted Time Warner's argument that "the better rule of law is that there is no affirmative cause of action based on a claim of unlawful liquidated damages," and declared that "[s]uch a claim is merely a defense to enforcement of the penalty"). Although we do not embrace Time Warner's argument

58

that an unlawful-liquidated-damages claim can *never* constitute an affirmative cause of action, we do conclude that the customers cannot pursue such a claim absent either their refusal to pay the late fee or their payment of the fee under contemporaneous protest.[7]

¶ 20. Under the voluntary payment doctrine, the customers' capacity to bring such an unlawful-liquidated-damages claim cannot arise absent either their refusal to pay or their payment under contemporaneous protest. To varying degrees, our reasons for affirming the dismissal of the other contract claims apply here as well. Further, even if the late fees were improper—either unreasonable in amount or unlawful, in full, under state or federal regulations—the customers paid without protest, and Time Warner relied on those payments. Reliance on the monies received is a proper factor to consider when applying the voluntary payment doctrine. *See Heileman*, 105 Wis. 2d at 160–63 (mindful of government's need for financial planning, court held that voluntary payment doctrine precluded taxpayer from recovering unlawful property taxes when taxpayer "waited until long after the taxes involved . . . were spent" before demanding return of the money).

---

[7] Typically, a party asserting that liquidated damages are unreasonable does so in the course of defending against a claim to enforce a liquidated-damages clause of a contract, *see, e.g., Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 293–94, 187 N.W.2d 200 (1971) (customer who refused to take delivery on automobile defended against auto dealer's action, contending, in part, that the liquidated damages were unreasonable and therefore void); however, neither law nor logic absolutely precludes a party from ever bringing an action to recover unlawful liquidated damages.

Regularly receiving those late-fee payments, Time Warner continued its operations, projecting its profits and costs accordingly.[8] *Id.*

¶ 21. Therefore, while we discern certain differences between the customers' unlawful-liquidated-damages claim and their other substantive claims, we nevertheless conclude that the customers' unlawful-liquidated-damages claim was properly dismissed based on their voluntary payments.

C. *Declaratory and Injunctive Relief*

¶ 22. The customers' amended complaint also alleged a cause of action for "Declaratory Injunctive and Equitable Relief." The amended complaint requested:

> (a) [A] court determination of the rights of Plaintiffs and the Class and the corresponding rights of Time Warner concerning the imposition of late fees;

---

[8] Although we perceive differences in applying the voluntary payment doctrine to protect the government in a tax case and to protect the private enterprise in the instant case, some of a government's fiscal concerns, considered in *G. Heileman Brewing Co. v. City of La Crosse*, 105 Wis. 2d 152, 312 N.W.2d 875 (Ct. App. 1981), are analogous to a private entity's fiscal concerns as well:

> The requirement of resistance to or involuntary payment of a tax is one of public policy: government has an interest in allocating its resources. It is desirable that government know when it contemplates spending public funds that those funds are either available or subject to loss through tax refund. The requirement that one who seeks repayment of illegally assessed taxes notify the governmental unit that he wants them returned is not onerous. The inequity of paying illegally collected taxes is outweighed by the requirement that government know what amount of income it has available.

*Id.* at 161–62.

(b) [A] court declaration that Time Warner has unlawfully imposed excessive late fees on Plaintiffs and the Class Members;

(c) An order enjoining Time Warner from continuing to impose late fees that are not related to its reasonable costs;

(d) An order requiring Time Warner to conduct appropriate and necessary studies to determine the actual or reasonably anticipated damages that Time Warner might incur solely as a result of late payments and/or late paying customers;

(e) An order requiring Time Warner to disclose to its customers all information and facts discovered under the studies mentioned above;

(f) An order requiring Time Warner to send a notice to all of its customers concerning the terms and conditions under which any late fee or penalty will be assessed in the future; and

(g) A court order requiring Time Warner to refund to Plaintiffs and the Class Members all excessive late fees paid to Time Warner.

The circuit court dismissed this claim, asserting that the customers failed to allege that any of them had refused to pay a late fee and, therefore, concluded that the issue was not ripe for consideration. The customers now argue that the issue is ripe based on the allegations in the amended complaint that they "continue to be threatened with paying additional excessive late fees to Time Warner." We disagree.

¶ 23. The decision to grant or deny declaratory relief is within the sound discretion of the trial court. *State ex rel. Lynch v. Conta*, 71 Wis. 2d 662, 668, 239

N.W.2d 313 (1976). We review the trial court's discretionary decision to determine whether the trial court exercised its discretion within the confines of statutes and well-established precedents. *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). "While, as in all discretionary acts of a court, reasonable persons may sometimes differ in the outcome, all that this court need find to sustain a discretionary act is that the trial court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Id.*

¶ 24. In *Miller Brands-Milwaukee, Inc. v. Case*, 162 Wis. 2d 684, 470 N.W.2d 290 (1991), our supreme court explained:

> The facts or conditions which must exist in order for a court to grant declaratory relief are as follows:
>
> There must exist a justiciable controversy – that is to say:
>
> (1) A controversy in which a claim of right is asserted against one who has an interest in contesting it.
>
> (2) The controversy must be between persons whose interests are adverse.
>
> (3) The party seeking declaratory relief must have a legal interest in the controversy – that is to say, a legally protectible [sic] interest.
>
> (4) The issue involved in the controversy must be ripe for judicial determination.

*Id.* at 694. "A justiciable controversy requires the existence of present and fixed rights in contrast to hypo-

thetical or future rights. This is where we believe justiciable controversy and ripeness overlap." *Klaus v. Vander Heyden*, 106 Wis. 2d 353, 365, 316 N.W.2d 664 (1982) (citation omitted). In the instant case, we have already concluded that the trial court properly found that the customers' present and fixed rights to bring suit against Time Warner were eliminated by the operation of the voluntary payment doctrine. The customers are now asking for a determination of their hypothetical or future rights. We are satisfied that the trial court properly exercised its discretion in refusing to grant declaratory relief because this case is not yet ripe for judicial determination.

¶ 25. The Uniform Declaratory Judgments Act, WIS. STAT. § 806.04, allows "a court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedures" and, as such, "provides a remedy which is primarily anticipatory or preventive in nature." *Lister v. Board of Regents of Univ. of Wisconsin System*, 72 Wis. 2d 282, 307, 240 N.W.2d 610 (1976). However, "[c]ourts will not ... declare rights until they have become fixed under an established state of facts, and will not determine future rights in anticipation of an event that may never happen." *Selective Ins. Co. v. Michigan Mut. Liab. Ins. Co.*, 36 Wis. 2d 402, 407, 153 N.W.2d 523 (1967); *see also City of Janesville v. Rock County*, 107 Wis. 2d 187, 199, 319 N.W.2d 891 (1982); *Sova v. Ries*, 226 Wis. 53, 56, 276 N.W. 111 (1937).[9] Here, the customers' amended complaint asks this court to construe their rights "in

_____

[9] The dissent criticizes our reliance on these three cases and the above quoted proposition for which they have been cited. The dissent asserts that the proposition has been explicitly

anticipation of an event that may never happen" – their failure to pay the cable bills on time and Time Warner's imposition of the five-dollar late fee.[10] Thus, the trial court properly exercised its discretion in dismissing the customers' request for declaratory or injunctive relief.

¶ 26. The Uniform Declaratory Judgments Act also provides that "[a]ny person interested under a . . . written contract . . . may have determined any question of construction or validity under the . . . contract . . .

---

overruled by *Loy v. Bunderson*, 107 Wis. 2d 400, 413–14, 320 N.W.2d 175 (1982). The dissent is wrong.

It is true that *Loy* overruled *Heller et al. v. Shapiro et al.*, 208 Wis. 310, 242 N.W.2d 174 (1932), because the supreme court determined that in *Heller*, the application of the proposition quoted here unacceptably restricted the trial court's exercise of its discretion. *Loy*, 107 Wis. 2d at 413–14. However, the cases we cited have not been criticized, much less overruled. Moreover, since *Loy*, this court has relied on the proposition that the prerequisites to a declaratory judgment " 'insure that a bona fide controversy exists and that this court in resolving the question raised will not be acting in a merely advisory capacity.' " *Sipl v. Sentry Indem. Co.*, 146 Wis. 2d 459, 465, 431 N.W.2d 685 (Ct. App. 1988) (quoting *Tooley v. O'Connell*, 77 Wis. 2d 422, 434, 253 N.W.2d 335 (1977)).

[10] The dissent notes that "Time Warner argues that the customers ignore 'the fundamental distinction under the law between a court adjudicating a concrete future dispute before harm comes to pass and a court merely advising as to circumstances that may never come to pass.' " In rejecting this argument, the dissent asserts, "Unless Time Warner is suggesting, however, that it does not intend to continue assessing late fees, the circumstances are certain to come to pass." These circumstances are only certain to come to pass if the customers fail to pay their cable bills on time, which may or may not occur. Nevertheless, the Uniform Declaratory Judgments Act forbids this court from construing the parties' rights based on a prognostication, however likely.

64

and obtain a declaration of rights, status or other legal relations thereunder." Wɪs. Sᴛᴀᴛ. § 806.04(2). However, it is clear from the amended complaint that the customers are seeking much more than a construction of the validity of the contract or a declaration of their rights thereunder. For example, the customers asked the trial court to declare "that Time Warner has unlawfully imposed excessive late fees on Plaintiffs and the class members," and requested "[a] court order requiring Time Warner to refund to Plaintiffs and the Class Members all excessive late fees paid to Time Warner." These claims amount to an action for damages and are not the proper subject of an action for declaratory judgment. *See F. Rosenberg Elevator Co. v. Goll*, 18 Wis. 2d 355, 363, 118 N.W.2d 858 (1963) ("It is not the role of declaratory judgment to take the place of an action for damages."). Further, the remaining claims seek court orders requiring Time Warner to perform various types of tasks (e.g. conducting studies, disclosing certain information, providing notice to customers, etc.). These requests are well beyond the scope of the Uniform Declaratory Judgments Act and exceed the trial court's powers to construe contracts and declare the parties' rights thereunder.

■■

¶ 27. Moreover, the trial court's decision whether to grant declaratory relief is discretionary, *see State ex rel. Lynch*, 71 Wis. 2d at 668, and we conclude that the trial court properly exercised its discretion. In rendering its oral decision on the motion to dismiss, the trial court asserted that the amended complaint failed to allege that the case was ripe for declaratory judgment. Specifically, the trial court noted that "no one asserted that I have a late bill . . . that I have not paid it, and I don't intend to pay it, and I've not paid the late fee as

well." The trial court concluded that based on the facts contained in the amended complaint the customers failed to allege that they were in a position which was ripe for declaratory relief. Whether this court would have arrived at a different decision is not at issue. *Loy*, 107 Wis. 2d at 414–415. Rather, we are satisfied that the trial court reached a decision that a reasonable judge could reach.[11]

---

[11] Furthermore, our supreme court's recent decision in *Milwaukee Dist. Council 48 v. Milwaukee County*, 2001 WI 65, 244 Wis. 2d 333, 627 N.W.2d 866, supports our decision. In that case the supreme court addressed the issue of whether a labor union was able to seek a declaratory judgment construing the due process rights of its members who had been terminated for cause after fulfilling the minimum requirement for a deferred vested pension. *Id.* at ¶ 3–5. Specifically, one of the issues addressed by the court was whether the action was ripe for declaratory relief. In holding that the case was ripe for declaratory relief, the court rejected the county's argument that the matter was not yet ripe because it had not officially denied the employee his pension. *Id.* at ¶ 42. The court did so because it was not the employee's entitlement to the pension that was at issue, rather it was the question of the employee's due process rights that were the subject of the declaratory judgment action. Specifically, the court asserted that "[a]n employee need not have been denied pension benefits to satisfy the ripeness required *in this type of action.*" *Id.* at ¶ 44 (emphasis added). The type of action involved in that case – the determination of the employee's due process rights – permitted the supreme court to hold that the case was ripe for declaratory relief. Our analysis in the instant case is distinguishable from that found in *Milwaukee Dist. Council 48*.

In *Milwaukee Dist. Council 48*, the supreme court *explicitly* stated that "[o]ur holding today is confined to procedural rights. We are neither asked nor required to define the exact interest that a county employee has in a pension after the employee has worked the minimum number of years to qualify for a pension."

¶ 28. For these reasons, we conclude the trial court properly exercised its discretion in dismissing the customers' claim for declaratory and injunctive relief.

*By the Court.*—Judgment affirmed.

¶ 29. SCHUDSON, J. (*concurring, in part; dissenting, in part*). I write separately to: (1) provide added factual background to assure a complete understanding of the customers' claims; (2) identify the legal pivot

---

*Id.* at ¶ 64. In holding that the case was ripe for declaratory relief, the court explained that "[t]he union seeks a declaration about the decision-making process in which an employee is discharged and then denied benefits. Following his discharge, [the employee] wants to know his rights." *Id.* at ¶ 44. Notably, and directly relevant to the instant case, the employee did not seek a declaratory judgment determining whether he had worked the minimum number of years; whether he was actually properly discharged for cause or whether he was entitled to his pension, and, if so, the amount of benefits. Had the supreme court determined that the employee could seek a declaratory judgment to answer these questions, then we would be able to grant the customers' request for declaratory relief in this case. However, the supreme court's decision was confined to a declaration of the *due process rights only.*

Here, unlike the parties in *Milwaukee Dist. Council 48*, the customers are not seeking a determination of their constitutional due process rights, nor are they seeking a construction of a statute or a pronouncement on the statute's constitutional validity, *see id.* at ¶ 41; instead the customers are seeking an advisory opinion regarding the reasonableness of the late fees imposed by Time Warner (fees that will only be imposed in the future *if* the customers fail to pay their cable bill on time or at all), an adjudication of Time Warner's liability should the court happen to conclude that the late fees are unreasonable, and a calculation of the resulting damages (as well as various court orders). Given the trial court's discretion it properly declined to apply the Uniform Declaratory Judgment Act in the instant case.

point of the majority's decision on the unlawful-liquidated-damages issue, which, I believe, is appropriate for certification and now merits supreme court review; and (3) explain my disagreement with the majority's conclusion on the customers' claim for declaratory and injunctive relief.

## I. The Customers' Claims

¶ 30. Because in reviewing a circuit court's dismissal of a complaint, we must "accept the facts stated in the complaint, along with all reasonable inferences which may be drawn from them, as true," *Wausau Tile, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 245, 593 N.W.2d 445 (1999), it is essential to completely consider a complaint's allegations. Further, because some of the customers' allegations, not mentioned in the majority opinion, are important to our review of the circuit court's dismissal of the claims for unlawful liquidated damages and for declaratory and injunctive relief, I begin by offering additional information to supplement the majority's summary of the customers' amended complaint.

¶ 31. The customers alleged that Time Warner was a "licensed monopoly" that "unilaterally set and determined" the contractual terms with its customers, and that it "consciously designed its billing cycles and due dates to uniformly and systematically 'catch' a consistent percentage of its customer base paying late." Further, they alleged:

> By use of the term "late fee"[1] and by other statements, representations, and omissions, Time Warner

---

[1] The customers maintain that "it is a misnomer to even refer to this $5.00 charge as a late fee because Time Warner's

> fully implies that the "late fee" constitutes only an administrative or service charge to cover Time Warner's costs that result from late payments and/or late paying customers.
>
> In reality, the vast percentage of the "late fee" represents pure profit to Time Warner.

(Footnote added.) More specifically, the amended complaint alleged:

> Time Warner fraudulently misrepresents, conceals, suppresses, and omits certain information about the late fee from each customer, including the information that: (1) the late fee amount is not based on a reasonable advance estimate of the actual or anticipated loss (i.e., costs) that might be caused by late payments and/or late paying customers; (2) the late fee amount does not, in fact, bear a reasonable relationship to the costs incurred by Time Warner solely as a result of late paying customers and/or late payments; (3) the actual damages/costs, including interest, suffered by Time Warner as a result of a customer who pays "late" is between $0.38 and $0.48 per customer per month, or approximately 1/10 of the late fee that Time Warner imposes upon such a customer; (4) Time Warner uses the late fee to recover costs wholly unrelated to late payments such as non-payment costs or collection costs

customers pay for cable service one month in advance." Thus, the amended complaint alleged:

> Pursuant to Time Warner's policy, late fees are assessed even if the bill is paid after the due date, but before the end of the complete service period.
>
> Customers are assessed a late fee even though they have not yet received all of the cable services for which payment is allegedly late.

The majority opinion and I, however, like the parties on appeal, refer to the charge as a "late fee."

69

related to non-paying customers; (5) Time Warner uses the late fee as a profit generating device and receives substantial annual revenues from late fees; and (6) Time Warner disguises this penalty/profit generating device as an administrative charge for late payments.

Moreover, the amended complaint alleged: "Time Warner already has incorporated these non-payment costs, or collection costs relating to non-paying customers, into Time Warner's basic cable rates submitted to the [Federal Communications Commission] for approval. Time Warner thus is enjoying a 'double recovery' of these costs."

¶ 32. The customers brought numerous claims and, on appeal, reiterating the contentions in the amended complaint, they assert that "Time Warner acted unreasonably in structuring its billing system to systematically snare each month a significant percentage of its customers with late fees." Explaining that the cable television industry is highly regulated, they further assert that while rates for basic service and premium channels are set by local, state, and federal authorities, "the imposition of late fees is the only aspect of cable service that is not regulated." Thus, they contend, Time Warner's late fees "[t]ak[e] advantage of this oversight." The customers maintain that "a cable company should not be allowed to use late fees as a profit source," and assert that Time Warner "systematically gouges its customers by charging excessive late fees" in order to gain millions of dollars in profit beyond that allowed under the regulated rates.

## II. Unlawful Liquidated Damages[2]

¶ 33. The majority rightfully rejects the argument, as phrased in Time Warner's brief to this court, that "the alleged unenforceability of the cable television contract[] is merely a defense, and does not state an affirmative cause of action." The majority correctly observes that "neither law nor logic absolutely precludes a party from ever bringing an action to recover unlawful liquidated damages." Majority at ¶ 19 n.7. The majority's brief references to *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 293–94, 187 N.W.2d 200 (1971), *see* Majority at ¶¶ 17, 19 n.7, however, are inadequate to explain why *Northwestern* does not support Time Warner's argument.

¶ 34. In *Northwestern*, the supreme court commented: "The unreasonableness of the liquidated damages, then, is properly a matter of defense. It cannot be reached by demurrer but is a question to be determined after trial." *Northwestern*, 51 Wis. 2d at 295. This comment, however, was with specific reference to the

---

[2] In referring to the claim for "unlawful liquidated damages," the majority opinion and I simply utilize the terminology employed by the parties on appeal. In doing so, however, we should clarify two things. First, we have not reached any conclusion about whether these "liquidated damages" are reasonable and enforceable. Thus, if we were tracking the terminology in *Wassenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983), we would be speaking of these as "stipulated damages" unless and until the circuit court concluded that the damages were unreasonable and unenforceable. *See id.* at 521. Second, and in a similar vein, in referring to the customers' claim as one for "liquidated damages," we should not ignore the amended complaint's reference to liquidated damages *or penalties,* or presume that the $5.00 late fee was not a penalty. *See id.* (distinguishing "a valid and enforceable liquidated[-]damages provision" from "an unenforceable penalty").

litigation in that case; it did not preclude the possibility of a party bringing an unlawful-liquidated-damages claim.

¶ 35. While Wisconsin's appellate courts have not clarified that a party may bring an unlawful-liquidated-damages claim, the proposition that a party may do so is rather unremarkable. Indeed, in a variety of contexts, other courts have confirmed the validity of such a claim. *See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 511 P.2d 1197 (Cal. 1973); *Beasley v. Wells Fargo Bank*, 1 Cal. Rptr. 2d 446 (Cal. Ct. App. 1991).

¶ 36. Thus, in theory at least, the customers may bring an unlawful-liquidated-damages claim. Whether they may do so in the instant case, however, "absent either their refusal to pay or their payment under contemporaneous protest," depends on whether, as the majority has concluded, for reasons related to fiscal planning and predictability, the circumstances of a private enterprise are comparable to those of government. *See* Majority at ¶ 20 & n.8. But does the rationale of *G. Heileman Brewing Co. v. City of La Crosse*, 105 Wis. 2d 152, 312 N.W.2d 875 (Ct. App. 1981), encompass private enterprise? Is it enough to say, as the majority declares, that "some of a government's fiscal concerns . . . are analogous to a private entity's fiscal concerns as well"? *See* Majority at ¶ 20 n.8.

¶ 37. That's the tenuous pivot point in the majority's decision on the customers' unlawful-liquidated-damages claim. After all, it is undisputed that if the late fee (or a portion thereof) is unlawful, Time Warner never should have charged it. Why, then, should Time Warner be allowed to take financial advantage of its own wrongdoing? If the *Heileman* rationale applies, the answer is clear, and Time Warner is in the clear. If, however, the *Heileman* rationale (explaining

why *government* is insulated against such a claim) does not apply to a private enterprise that, in our free-market economy, perhaps should be expected to suffer the consequences of its wrongdoing, then the customers' claim survives, notwithstanding the voluntary payment doctrine.

¶ 38. This presents an issue of law and public policy—exactly the kind of issue that is properly resolved by the supreme court on certification from this court. *See Cook v. Cook*, 208 Wis. 2d 166, 188–89, 560 N.W.2d 246 (1997) (explaining that primary function of court of appeals is error correcting and that primary function of supreme court is "law defining and law development").

¶ 39. Moreover, in *Wassenaar v. Panos*, 111 Wis. 2d 518, 331 N.W.2d 357 (1983), the supreme court, *in linking the validity of liquidated damages to public policy,* and in requiring circuit courts to consider the facts underlying liquidated-damages clauses with careful case-by-case review, provided the basis for concluding that courts could recognize a party's right to claim unlawful liquidated damages, perhaps even in the absence of payment or payment under protest. The supreme court declared:

> We agree with the court of appeals that the validity of a stipulated[-]damages clause[3] is a question of law for the trial judge rather than a mixed question of fact and law for the jury. *The validity of a stipulated[-] damages clause is a matter of public policy,* and as in other contract cases the question of contractual validity

[3] The supreme court clarified that it was "us[ing] the term 'stipulated damages' . . . to refer to the contract [clause stipulating damages] and the term 'liquidated damages' to refer to stipulated damages which a court holds to be reasonable and will enforce." *Wassenaar*, 111 Wis. 2d at 521; *see also* n.2, above.

73

as a matter of public policy is an issue the trial judge initially decides. But we disagree with the court of appeals that the label of "question of law" automatically relieves the trial court from its duty to consider evidence or gives the appellate court free rein in reviewing the trial court's decision.

> *Even though the trial court's conclusion regarding the validity of the stipulated[-]damages clause is a legal conclusion—a policy judgment—that legal conclusion will frequently be derived from a resolution of disputed facts or inferences. The trial judge, not the jury, determines these facts and inferences. In deciding whether a stipulated[-]damages clause is valid, then, the trial judge should inquire into all relevant circumstances,* including such matters as the existence and extent of the anticipated and actual injury to the nonbreaching party.

*Id.* at 523–25 (footnotes omitted; footnote and emphases added). Additionally, the supreme court clarified that the party challenging the stipulated-damages provision of a contract has "the burden of proving facts which would justify the trial court's concluding that the clause should not be enforced." *Id.* at 526.

¶ 40. The supreme court then articulated "the test that the trial court (and the appellate court) should apply in deciding whether a stipulated[-]damages clause is valid," *see id.*, explaining the competing considerations favoring and disfavoring stipulated damages:

> The overall single test of validity is whether the clause is reasonable under the totality of circumstances.
>
> The reasonableness test is a compromise the courts have struck between two competing viewpoints toward

74

stipulated[-]damages clauses, one favoring enforcement of stipulated[-]damages clauses and the other disfavoring such clauses.

Enforcement of stipulated[-]damages clauses is urged because the clauses serve several purposes. The clauses allow the parties to control their exposure to risk by setting the payment for breach in advance. They avoid the uncertainty, delay, and expense of using the judicial process to determine actual damages. They allow the parties to fashion a remedy consistent with economic efficiency in a competitive market, and they enable the parties to correct what the parties perceive to be inadequate judicial remedies by agreeing upon a formula which may include damage elements too uncertain or remote to be recovered under rules of damages applied by the courts. In addition to these policies specifically relating to stipulated[-]damages clauses, considerations of judicial economy and freedom of contract favor enforcement of stipulated[-]damages clauses.

A competing set of policies disfavors stipulated [-]damages clauses, and thus *courts have not been willing to enforce stipulated[-]damages clauses blindly without carefully scrutinizing them.* Public law, not private law, ordinarily defines the remedies of the parties. Stipulated damages are an exception to this rule. Stipulated damages allow private parties to perform the judicial function of providing the remedy in breach[-]of[-]contract cases, namely, compensation of the nonbreaching party, and courts must ensure that the private remedy does not stray too far from the legal principle of allowing compensatory damages. Stipulated damages substantially in excess of injury may justify an inference of unfairness in bargaining or an objectionable *in terrorem* agreement to deter a party from breaching the contract, to secure performance, and to punish the breaching party if the deterrent is ineffective.

The reasonableness test strikes a balance between the two competing sets of policies by ensuring that the court respects the parties' bargain but prevents abuse.

*Id.* at 526–29 (citations and footnotes omitted; emphasis, other than *in terrorem,* added).

¶ 41. The supreme court then articulated and discussed three questions to be considered in helping to determine whether a stipulated-damages clause is reasonable. *See id.* at 529–33. In the instant case, should the unlawful-liquidated-damages claim survive, the circuit court would need to consider and address these questions, with consideration of the supreme court's analysis:

(1) Did the parties intend to provide for damages or for a penalty? (2) Is the injury caused by the breach one that is difficult or incapable of accurate estimation at the time of contract? and (3) Are the stipulated damages a reasonable forecast of the harm caused by the breach?

Recent discussions of the test of reasonableness have generally discarded the first factor, subjective intent of the parties, because subjective intent has little bearing on whether the clause is objectively reasonable. The label the parties apply to the clause, which might indicate their intent, has some evidentiary value, but it is not conclusive.

The second factor, sometimes referred to as the "difficulty[-]of[-]ascertainment" test, is generally viewed as helpful in assessing the reasonableness of the clause. The greater the difficulty of estimating or proving damages, the more likely the stipulated damages will appear reasonable. If damages are readily ascertainable, a significant deviation between the stipulated amount and the ascertainable amount will appear unreasonable. The "difficulty[-]of [-]ascertainment" test

76

has several facets, depending on whether the stipulated[-]damages clause is viewed from the perspective of the time of contracting or the time of breach (or trial). These facets include the difficulty of producing proof of damages at trial; the difficulty of determining what damages the breach caused; the difficulty of ascertaining what damages the parties contemplated when they contracted; the absence of a standardized measure of damages for the breach; and the difficulty of forecasting, when the contract is made, all the possible damages which may be caused or occasioned by the various possible breaches.

The third factor concerns whether the stipulated [-]damages provision is a reasonable forecast of compensatory damages. Courts test the reasonableness of the parties' forecast, as they test the "difficulty of ascertainment" by looking at the stipulated[-]damages clause from the perspective of both the time of contracting and the time of the breach (or trial).

The second and third factors are intertwined, and both use a combined prospective-retrospective approach. Although courts have frequently said that the reasonableness of the stipulated[-]damages clause must be judged as of the time of contract formation (the prospective approach) and that the amount or existence of actual loss at the time of breach or trial is irrelevant, except as evidence helpful in determining what was reasonable at the time of contracting (the retrospective approach), the cases demonstrate that the facts available at trial significantly affect the courts' determination of the reasonableness of the stipulated[-]damages clause. If the damages provided for in the contract are grossly disproportionate to the actual harm sustained, the courts usually conclude that the parties' original expectations were unreasonable. Our prior decisions indicate that this court has employed the prospective-retrospective approach in determining the reasonableness of the stipulated[-]damages clauses and has looked

at the harm anticipated at the time of contract formation and the actual harm at the time of breach (or trial).

As the above discussion demonstrates, the various factors and approaches to determine reasonableness are not separate tests, each of which must be satisfied for a stipulated[-]damages clause to stand. Reasonableness of the stipulated[-]damages clause cannot be determined by a mechanical application of the three factors cited above. Courts may give different interpretations to or importance to the various factors in particular cases.

In ruling on the reasonableness of a stipulated [-]damages clause, the trial judge should take into account not only these factors but also the policies that gave rise to the adoption of the reasonableness test as the test for distinguishing between enforceable liquidated[-]damages provisions and unenforceable penalty provisions.

*Id.* (citations and footnotes omitted).

¶ 42. In the instant case, the circuit court correctly noted that, for purposes of measuring the sufficiency of the amended complaint, "we have to assume that [the $5.00 late fee is] liquidated damages," and "we have to assume that . . . the real cost is really about 48 cents, and that there's a reasonable likelihood these are unreasonable and unconscionable liquidated damages." Nevertheless, without carrying out any fact-finding under the *Wassenaar* test, and without explaining its implicit conclusion that the voluntary payment doctrine applied to the customers' unlawful-liquidated-damages claim, the circuit court dismissed that claim as well.

¶ 43. If the *Heileman* rationale does not apply to Time Warner, the circuit court erred. Consistent with *Wassenaar*, the circuit court would have been required

both to fulfill its "duty to consider evidence," *see Wassenaar*, 111 Wis. 2d at 524, and to "inquire into all relevant circumstances," *see id.* at 525.

¶ 44. I have considered whether the voluntary-payment-doctrine rationale for affirming the dismissal of the customers' other claims to recover past payments could apply to the unlawful-liquidated-damages claim as well. After all, one might ask, would not the same considerations regarding duty to inform, fraud, and economic duress undercut any claim that the liquidated damages were unreasonable? I think not.

¶ 45. The unlawful-liquidated-damages claim, as measured by the supreme court's extensive discussion in *Wassenaar*, implicates law and public policy considerations that are quite distinct from those coming into play under the voluntary payment doctrine. Simply stated, the voluntary payment doctrine exposes whether the customers paid voluntarily; the unlawful-liquidated-damages claim, however, tests whether the amount they paid was reasonable and lawful.

¶ 46. Therefore, while it is conceivable that the fact that customers voluntarily pay the late fee could be among "all [the] relevant circumstances" affecting the circuit court's determination of the reasonableness of the $5.00 fee, *see Wassenaar*, 111 Wis. 2d at 525, the voluntary payment doctrine, as a matter of law, would not preclude the customers' unlawful-liquidated-damages claim, unless the *Heileman* rationale applies. If the *Heileman* rationale does not apply, the circuit court would need to conduct fact-finding, consistent with *Wassenaar*, to determine the merits of the customers' unlawful-liquidated-damages claim.[4]

_____
[4] At first glance, the $5.00 late fee may seem so modest, and the costs of collection may seem so obvious, that the fee might

## III. Declaratory and Injunctive Relief

¶ 47. If Time Warner customers could *never* seek to recover the allegedly unlawful liquidated damages they paid (unless they had paid under contemporaneous protest, which, of course, assumes that, *at the time they paid,* they knew of the factual and legal basis for protest), and if they could *never* gain declaratory and injunctive relief (unless they risked the loss of their cable service by refusing to pay), Time Warner's practices could go unchallenged and even unlawful late fees would go unchecked. Nevertheless, the majority concludes that this matter was not ripe for declaratory and injunctive relief because the customers had not alleged that any of them had refused to pay a late fee. The customers argue that the amended complaint adequately established the ripeness of the dispute by alleging that they "continue to be threatened with paying additional excessive late fees to Time Warner." The customers are correct.

¶ 48. As we recently reiterated:

It has long been held that the purposes of the [Uniform Declaratory Judgments] Act are furthered by authorizing the [circuit] court to take jurisdiction at a point in time that may be earlier than it would ordinarily do so. And in so doing, the Act provides relief, that is to some degree, anticipatory or preventive in nature.

be deemed reasonable without any need for further inquiry. At this juncture, however, the record provides no evidence that could allow a court to reach that conclusion. Moreover, we should be mindful that such fees may mount monthly and affect countless consumers. Further, the lawfulness of the $5.00 monthly late fee may depend on whether, as the customers allege, administrative costs for late payments already have been accounted for in Time Warner's regulated rates.

80

*Juneau County v. Courthouse Employees,* 216 Wis. 2d 284, 293, 576 N.W.2d 565 (Ct. App.), *aff'd,* 221 Wis. 2d 630, 585 N.W.2d 587 (1998). Moreover, the Act "is declared to be remedial; its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status and other legal relations; and is to be liberally construed and administered." Wis. Stat. § 806.04(12) (1999–2000).

¶ 49. Notwithstanding the failure to allege that any customer had either refused to pay a late fee or paid such a fee under protest, the amended complaint's claim for declaratory and injunctive relief sought to "settle . . . uncertainty and insecurity with respect to rights . . . and other legal relations." *See* Wis. Stat. § 806.04(12). It alleged not only that the customers had "paid at least one excessive and unconscionable late fee," but also that they "continue to be threatened with paying additional excessive late fees to Time Warner."

¶ 50. Nonetheless, Time Warner argues that the customers ignore "the fundamental distinction under the law between a court adjudicating a concrete future dispute before harm comes to pass and a court merely advising as to *circumstances that may never come to pass.*" (Emphasis added.) Unless Time Warner is suggesting, however, that it does *not* intend to continue assessing late fees, the *circumstances are certain to come to pass.* The controversy, therefore, is as ripe as the finest autumn apple waiting to be picked.

¶ 51. One case that might seem to support the dismissal of the customers' claim for declaratory and injunctive relief actually helps to establish the viability of the customers' claim. In *Horne v. Time Warner Operations, Inc.,* 119 F. Supp. 2d 624 (S.D. Miss. 1999), the federal court confronted claims comparable to those in the instant case. The court, after declaring that the

dismissal of the cable customers' contract claims was appropriate, further concluded that the dismissal of their claim for declaratory and injunctive relief was required as well. *Id.* at 630. The court explained that claims for declaratory and injunctive relief "do[] not stand alone, but require[] a viable underlying legal claim." *Id.* Therefore, the court concluded, because the underlying contract claims had been dismissed, the declaratory and injunctive claims could not stand. *Id.*

¶ 52. *Horne,* however, was decided under Mississippi law. *See id.* at 628–30. Mississippi is one of the few states that does not subscribe to the Uniform Declaratory Judgments Act. *See* WIS. STAT. ANN. § 806.04 table of jurisdictions wherein act has been adopted (1994). Wisconsin law in this area, however, is clear. In sharp contrast to Mississippi law, our supreme court has declared:

> The underlying philosophy of the Uniform Declaratory Judgments Act is to enable controversies of a justiciable nature to be brought before the courts for settlement and determination *prior to the time that a wrong has been threatened or committed. The purpose is facilitated by authorizing a court to take jurisdiction at a point earlier in time than it would do under ordinary remedial rules and procedures. As such, the Act provides a remedy which is primarily anticipatory or preventative in nature.*

*Lister v. Bd. of Regents,* 72 Wis. 2d 282, 307, 240 N.W.2d 610 (1976) (emphasis added); *see also Loy v. Bunderson,* 107 Wis. 2d 400, 415, 320 N.W.2d 175 (1982).

¶ 53. In an extraordinary effort to jettison the customers' claim for declaratory and injunctive relief, *the majority relies exclusively on a proposition that has been overruled*—that " '[c]ourts will not ... declare rights until they have become fixed under an estab-

lished state of facts, and will not determine future rights in anticipation of an event that may never happen.' " *See* Majority at ¶ 25. That proposition, often repeated in supreme court decisions including those the majority cites, was overruled. *Loy*, 107 Wis. 2d at 413–14 ("We expressly overrule it . . . .").[5]

[5] Stubbornly, the majority attempts to explain its allegiance to overruled law. *See* Majority at ¶ 25 n.9. In doing so, however, it multiplies its errors. Thus, I shall try, even more explicitly, and with the help of the supreme court's most recent pronouncement on the law of declaratory judgment, to elaborate the bases for my determination that the law requires reversal of the dismissal of the customers' claim for declaratory and injunctive relief.

(1) The majority claims:

> It is true that *Loy* overruled *Heller et al. v. Shapiro et al.*, 208 Wis. 310, 242 N.W.2d [sic] 174 (1932), because the supreme court determined that in *Heller*, the application of the proposition quoted here unacceptably restricted the trial court's exercise of its discretion. *Loy*, 107 Wis. 2d at 413–14. However, the cases we cited have not been criticized, much less overruled.

Majority at ¶ 25 n.9.

Once again, the majority misreads *Loy*. Whether *Heller* and the other *cases* on which the majority relies have been criticized or overruled is incidental to the fact that *the proposition on which the majority relies has been overruled*. In full context, the supreme court declared:

> It appears to us that *Heller* went too far in its requirement that all adjudicatory facts be resolved as a prerequisite to a declaration of rights. The *Heller* holding and rationale did not further the purposes for which the Declaratory Judgments Act was adopted by the legislature. *Heller*, if interpreted in accordance with the tenor of its rationale, would erode substantially the authority of a court to declare rights and status, and, if followed to its logical conclusion, would require that all facts at issue, including the ultimate injury or damage to a party, be determinable

83

before declaratory action could be brought. What *Heller* dictates is a traditional lawsuit after a party is aggrieved. It places undue restraints upon the Declaratory Judgments Act and throttles judicial discretion. *We expressly overrule it in respect to the statement therein that:*

> *"[T]he declaratory relief statute [only justifies] a declaration of rights upon an existing state of facts, not one upon a state of facts that may or may not arise in the future."*

*Loy v. Bunderson,* 107 Wis. 2d 400, 413–14, 320 N.W.2d 175 (1982) (quoted source omitted; emphasis added).

(2) The majority also asserts that declaratory judgment was inappropriate because "the customers are seeking much more than a construction of the validity of the contract or a declaration of their rights thereunder." Majority at ¶ 26. That, however, is not at all unusual; additional claims often accompany actions for declaratory and injunctive relief. In *Loy,* the supreme court commented that declaratory judgment was appropriate despite the fact that, "[o]f course, it is not conclusive in respect to the entire cause of action." *Loy,* 107 Wis. 2d at 411. And, indeed, the majority's premise is absolutely refuted by the statute itself: "Courts of record within their respective jurisdictions shall have power to declare rights, status, and other legal relations *whether or not further relief is or could be claimed."* WIS. STAT. § 806.04(1) (1999–2000) (emphasis added).

(3) The majority maintains that the circuit court correctly exercised discretion in dismissing the declaratory judgment claim because "the customers failed to allege that any of them had refused to pay a late fee." *See* Majority at ¶ 22. As explained, however, that only would have been required under the proposition that has been overruled. And recently, the supreme court, reiterating the correct propositions governing declaratory judgments, rejected the argument that a union could not seek declaratory judgment regarding the pension rights of one of its members because he "ha[d] yet to be formally denied a pension." *Milwaukee Dist. Council 48 v. Milwaukee County,* 2001 WI 65, ¶¶ 34, 42, 244 Wis. 2d 333, 627 N.W.2d 866. Concluding that

ments Act, Wɪs. Sᴛᴀᴛ. § 806.04, provides that "[a]ny person interested under a . . . written contract . . . may have determined any question of construction or validity arising under the . . . contract . . . and obtain a declaration of rights, status or other legal relations thereunder." Wɪs. Sᴛᴀᴛ. § 806.04(2) (1999–2000). And, as we have declared: "We construe [Wɪs. Sᴛᴀᴛ.] § 806.04(2) liberally as it affords relief from an

"[a]n employee need not have been denied pension benefits to satisfy the ripeness required in this type of action," *id.* at ¶ 44, the supreme court explained:

> By definition, the ripeness required in a declaratory judgment is different from the ripeness required in other actions. For example, in a declaratory action involving a forfeiture statute, "[p]otential defendants may seek a construction of a statute or a test of its constitutional validity without subjecting themselves to forfeitures or prosecution." *Thus, a plaintiff seeking declaratory judgment need not actually suffer an injury before seeking relief under Wis. Stat. § 806.04(2).*

*Id.* at ¶ 41 (citation omitted; emphasis added).

(4) Finally, the majority searches for a safe shore in the standards showing deference to a circuit court's discretionary decision. *See* Majority at ¶ 27. But there, too, the majority's rationale crashes on the rocks of the circuit court's legally flawed decision. As the majority notes, the circuit court dismissed the declaratory judgment claim because no customer had yet refused to pay the late fee. As explained, however, such a requirement would only have existed under an overruled legal proposition.

Thus, once we abandon any lingering allegiance to overruled law, and once we apply the law—as clearly and repeatedly stated starting with *Loy* in 1982 and continuing through *Milwaukee Dist. Council 48* in 2001—we must reverse the dismissal of the customers' claim for declaratory and injunctive relief.

uncertain infringement of a party's rights." *Town of Eagle v. Christensen*, 191 Wis. 2d 301, 316, 529 N.W.2d 245 (Ct. App. 1995).

¶ 55. Unquestionably, the customers' claim for declaratory and injunctive relief is encompassed by the Wisconsin standards. Even untethered from the other claims, the customers' claim for declaratory and injunctive relief requires the circuit court's consideration and, indeed, such consideration would serve all parties by promptly clarifying their rights. Accordingly, on this issue, I respectfully dissent.